Todd M. Schneider, Esq. (SBN 158253)
Kyle G. Bates, Esq. (SBN 299114)
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
TTY: (415) 421-1665
tschneider@schneiderwallace.com
kbates@schneiderwallace.com

Garrett W. Wotkyns (Arizona Bar No. 025887) (*pro hac vice* application to be filed)
John J. Nestico (North Carolina Bar No. 39457) (*pro hac vice* application to be filed)
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
851 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Tel: (480)428-0144
Fax: (866)505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com
*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLORENCE LO | Case No.: |
| Plaintiff, | **COMPLAINT** |
| v. | **CLASS ACTION (ERISA)** |
| INTEL CORPORATION, THE INTEL CORPORATION INVESTMENT POLICY COMMITTEE, FINANCE COMMITTEE OF THE INTEL CORPORATION BOARD OF DIRECTORS, INTEL RETIREMENT PLANS ADMINISTRATIVE COMMITTEE, CHARLENE BARSHEFSKY, FRANK D. YEARY, JAMES D. PLUMMER, REED E. HUNDT, SUSAN L. DECKER, JOHN J. DONAHOE, DAVID S. POTTRUCK, RAVI JACOB, and DOES 1-40 Defendants. | |

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ....................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................................... 8

III.  PARTIES ..................................................................................................................... 8

    A.   Plaintiff .............................................................................................................. 8

    B.   Defendants ......................................................................................................... 9

        1.   Corporate Sponsor and Named Fiduciary Defendant ............................... 9

        2.   Intel Finance Committee Defendants ........................................................ 9

        3.   Investment Committee Defendants .......................................................... 11

        4.   Administrative Committee Defendants .................................................... 12

    C.   Relevant Non-Parties ....................................................................................... 12

IV.   TERMINOLOGY ...................................................................................................... 13

V.    CLASS ALLEGATIONS .......................................................................................... 16

    A.   Numerosity and Impracticability of Joinder .................................................... 17

    B.   Commonality .................................................................................................... 18

    C.   Typicality ......................................................................................................... 19

        1.   Target Date Class .................................................................................... 19

        2.   IGD Fund Class ....................................................................................... 20

    D.   Adequacy .......................................................................................................... 20

    E.   Rule 23(b)(1) .................................................................................................... 20

    F.   Rule 23(b)(2) .................................................................................................... 21

    G.   Rule 23(b)(3) .................................................................................................... 21

VI.   FACTUAL ALLEGATIONS ..................................................................................... 22

    A.   The Plans .......................................................................................................... 22

        1.   Intel Retirement Plan .............................................................................. 23

        2.   Intel 401(k) Plan ..................................................................................... 24

    B.   Fiduciary Responsibility for Investment of Assets .......................................... 25

C.    The Plans' Assets .................................................................. 26

    1.    Master Trust Investment Funds ....................................... 26

    2.    The Retirement Plan and the IGD Fund ........................... 28

    3.    The Intel TDFs ................................................................ 30

    4.    The Intel TDFs Imprudently Invested in Hedge Funds ......... 35

    5.    Hedge Funds and Private Equity Generally Are Not Suitable For Inclusion in Balanced Funds Like The IGD Fund ................................................ 38

    6.    Risks and Costs of Hedge Funds and Private Equity ............ 39

    7.    The Intel Fiduciaries Ignored the Nature of a 401(k) Plan ..... 46

    8.    Inadequate Disclosure of the Investments Underlying the Intel TDFs and IGD Fund .................................................................. 52

VII.    CLAIMS FOR RELIEF ................................................................. 56

Count I
    Imprudence in the Design, Management and Monitoring of the Intel Target Date Funds .................................................... 56

Count II
    Imprudence in the Design, Management and Monitoring of the Global IGD Fund ................................................... 58

Count III
    Finance Committee Defendants Failure to Monitor Other Fiduciaries ........... 60

Count IV
    Prohibited Transaction in Violation of ERISA § 406(a) with Respect to Any Hedge Fund or Private Equity Investment Which Granted a Carried interest to Any Manager of Such Fund .................................................. 62

Count V
    Co-fiduciary Liability Under ERISA § 405 ...................................... 65

VIII.    ENTITLEMENT TO RELIEF ....................................................... 67

IX.    PRAYER FOR RELIEF ................................................................. 67

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

*Braden v. Wal-Mart, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ............................................................... 64

*Goldenberg v. Indel, Inc.*,
    741 F. Supp. 2d 618 (D.N.J. 2010) ...................................................... 64

*Krueger v. Ameriprise Financial, Inc.*, No. 11-cv- 02781(SRN/JSM), 2012 WL 5873825 (D.
    Minn. Nov. 20, 2012) .......................................................................... 64

*Leber v. Citigroup, Inc.*,
    No. 07 Civ. 9329(SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ..................................... 64

*Mehling v. N.Y. Life Ins. Co.*,
    163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001) ...................................... 64

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009) ............................................................... 65


**Federal Statutes**

29 C.F.R. § 2550.404c-5(e)(4)(ii) ................................................................. 4

29 U.S.C. § 1105(a) ..................................................................................... 65

ERISA § 405(a) ............................................................................................ 65

ERISA § 408(b) *et seq.* ............................................................................... 64

**Internet Sources**

"Intel Corp. moved to external management for two big investment options that house all of the
    alternative investments in its $14.85 billion defined contribution plans."  Robert Steyer, *Intel
    hires manager for target-date, global funds*, Pensions & Investments (June 15, 2015),
    *available at* http://www.pionline.com/article/20150615/PRINT/306159980/intel-hires-
    manager-for-target-dateglobal-funds (last visited Jan. 26, 2016) ............................................. 6

Alexandra Stevenson & Michael Corkery, *Calpers, Nation's Biggest Pension Fund, to End
    Hedge Fund Investments*, The New York Times (Sept. 15, 2014), *available
    at* http://dealbook.nytimes.com/2014/09/15/nations-biggest-pension-fund-to-end-hedge-fund-
    investments/ (last visited Jan. 26, 2016) .................................................. 38

Alexandra Stevenson, *Hedge Fund Assets Decline by Biggest Amount Since Financial Crisis*,
    New York Times (Oct. 20, 2015), *available at* decline-by-biggest-amount-since-financial-
    crisis.html ......................................................................................... 52

Alexandra Stevenson, *Hedge Funds Close Doors, Facing Low Returns and Investor
    Scrutiny*(May 17, 2015), available at
    http://www.nytimes.com/2015/05/18/business/dealbook/facing-low-returns-and-balky-
    investors-more-hedge-funds-close-doors.html?_r=2 (last visited Jan. 26, 2016) .................... 38

Andrew J. Bowden, Dir. of the Office of Compliance Inspections and Examinations, Spreading Sunshine in Private Equity, Address Before Private Fund Compliance Forum (May 16, 2014), *available at* http://www.sec.gov/news/speech/2014--spch05062014ab.html (last visited Jan. 26, 2016) ................................................................................................................................. 41

Barbara Bovbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity* .................................................................................................. 45, 50

Benchmark Financial Services, *Rhode Island Public Pension Reform: Wall Street's License to Steal,* Rhode Island Council 94 (October 17, 2013), *available at* http://ricouncil94.org/portals/0/uploads/documents/rhode%20island%20x.pdf (last visited Jan. 26, 2016) ................................................................................................................. 49

Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & Company Registered Investment Advisor Blog (January 16, 2014), *available at* http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/ (last visited Jan. 26, 2016) ......................................................................................... 32, 44

Chris Isidore, CNN Money, *Buffett says he's still paying lower tax rate than his secretary* (Mar. 4, 2013), *available at* http://money.cnn.com/2013/03/04/news/economy/buffett-secretary-taxes/ (last visited Jan. 26, 2016) ......................................................................... 64

Dept. of Labor, *Types of Retirement Plans*, *available at* http://www.dol.gov/general/topic/retirement/typesofplans (last visited Jan. 29, 2016) ............ 13

Donald J. Marples, *Taxation of Hedge Fund and Private Equity Managers,* published by the Congressional Research Serv. (Mar. 14, 2014), *available at* https://www.fas.org/sgp/crs/misc/RS22689.pdf (last visited Jan. 26, 2016) ........................... 62

ERISA Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Secretary of Labor: *Hedge Funds and Private Equity* ...................................... 40, 43

Geetesh Bhardwaj, Ph.D., *Do hedge funds hedge? The experience of the Great Recession,* Vanguard Research (2010), *available at* https://pressroom.vanguard.com/content/nonindexed/Do_hedge_funds_hedge_the_experience_of_the_great_recession.pdf (last visited Jan. 26, 2016) ........................................... 51

Hunsberger, Brent, *What's inside Intel's retirement plans. Hedge funds. Lots of 'em.*, The Oregonian (Aug. 30, 2014), *available at* http://www.oregonlive.com/finance/index.ssf/2014/08/whats_inside_intels_retirement.html (last visited Jan. 26, 2016). ...................................................................................... 6

Ilia D. Dichev & Gewn Yu, *Higher risk, lower returns: What hedge fund investors really earn*, 100 ...................................................................................................................... 50

Investopedia, *Leverage*, *available at* http://www.investopedia.com/terms/l/leverage.asp (last visited Jan. 28, 2016). ......................................................................................... 36

Investopedia, *What is a basis point?*, http://www.investopedia.com/ask/answers/05/basispoint.asp  (last visited Jan. 26, 2016) ........ 5

*Many unhappy returns*, The Economist (Aug. 20, 2011), *available at* http://www.economist.com/node/21526326 (last visited Jan. 26, 2016). ................................. 51

Margaret Collins & Devin Banerjee, *Would You Like Some Private Equity in Your 401(k)?*, Bloomberg Businessweek, (Apr. 4, 2013). *available at* http://www.bloomberg.com/bw/articles/2013-04-04/would-you-like-some-private-equity-in-your-401-k (last visited Jan. 26, 2016) ................................................................. 40

PIMCO DC Dialogue, Volume 9, Issue 3, Interview with Stuart Odell, *available at* http://media.pimco.com/Documents/PIMCO_DC_Dialogue_Odell_Schaus_Mar_Apr_2014.pdf ..................................................................................................................... passim

Preqin, *The Preqin Quarterly Update*: *Hedge Funds, Q3 2015* (2015), *available at* https://www.preqin.com/docs/quarterly/hf/Preqin-Quarterly-Hedge-Fund-Update-Q3-2015.pdf (last visited Jan. 26, 2016) ........................................................................................ 52

Proskauer Rose LLP, Client Alert:  Investment Advisers to ERISA Plans and Plan Asset Funds Will Be Subject to New Disclosure Obligations Effective July 1, 2012 (June 20, 2012), *available at* http://www.proskauer.com/publications/client-alert/investment-advisers-to-erisa-plans-and-plan-asset-funds-will-be-subject-to-new-disclosure-obligations-effective-july-1-2012/ (last visited Jan. 26, 2016) ................................................................. 63

Robert Steyer, *Intel hires manager for target-date, global funds*, Pensions & Investments (June 15, 2015), *available at* ................................................................................................... 32

*Rolling in It: Why Investors should kick up a fuss about hedge-fund fees*.  The Economist (Nov. 16, 2006), *available at* http://www.economist.com/node/8173853 (last visited Jan. 26, 2016) 48

Secs. And Exchange Comm'n, *Investor Bulletin: Accredited INvstors, available at* https://www.sec.gov/investor/alerts/ib_accreditedinvestors.pdf (last vsited Jan. 30, 2016) ..... 37

Securities and Exchange Commission, *No Action Letter under Inv. Co. Act of 1940, H.E.B. Inv. & Ret. Plan*(May 18, 2001), *available at* https://www.sec.gov/divisions/investment/noaction/heb051801.htm (last visited Jan. 26, 2016) ........................................................................................ 42

Simon Lack, *The Hedge Fund Industry Has Kept 98% of The Profits In Fees*, Business Insider (Jan. 24, 2012), *available at* http://www.businessinsider.com/how-the-hedge-fund-industry-has-kept-98-of-the-profits-in-fees-2012-1 (last visited Jan. 26, 2016) ...................................... 44

Stephen Foley, *Hedge Fund Investors Look for Liquid Alternatives,* Fin. Times (Feb.19, 2014), *available at* http://www.ft.com/cms/s/0/aa45fea6-993c-11e3-b3a2-00144feab7de.html#axzz3yilbZj7L ........................................................................ 39

Svea Herbst-Bayliss, *Hedge funds rise in 2010 but lag broader market,* Reuters (January 7, 2011), *available at* http://www.reuters.com/article/us-hedgefunds-performance-idUSTRE7063QR20110107 (last visited Jan. 26, 2016) ............................................................ 49

The Economist, *Rich Managers, poor clients: A devastating analysis of hedge-fund returns* (January 7, 2012), *available at* http://www.economist.com/node/21542452 (last visited Jan. 26, 2016) ........................................................................................................................ 50

The Economist, *The New Money Men,*(Feb. 17, 2005) (citing studies), *available* at http://www.economist.com/node/3666459 (last visited Jan. 26, 2016) ...................................... 49

## I.     NATURE OF THE ACTION

1.     Plaintiff Florence Lo brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), on behalf of the Intel 401(k) Savings Plan ("401(k) Plan") and the Intel Retirement Contribution Plan ("Retirement Plan") (collectively, "the Plans"), and on behalf of participants in the Plans[1]. Plaintiff brings this action for breaches of fiduciary duty by the Defendants and to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, or other appropriate equitable relief under ERISA § 502(a)(3). Plaintiff claims that Defendants breached their fiduciary duties by (a) investing significant portions of the Retirement Plan's assets in risky, illiquid and high-cost hedge fund, commodities and private equity investments; (b) creating custom target date funds that imprudently allocated substantial percentages of their assets to risky, illiquid and high-cost hedge fund, commodities and private equity investments; and (c) deliberately concealing the true nature and cost of these investments by failing to comply with their disclosure obligations under Sections 104 and 404 of ERISA, 29 U.S.C. §§ 1024, 1104. Plaintiff alleges that, by their actions, Defendants have caused Plaintiff, the Plans and the Plan participants to pay excessive fees and to suffer substantial investment losses.

2.     Plaintiff, a participant in both the 401(k) Plan and the Retirement Plan, seeks to represent two classes: (1) participants in the Plans whose accounts or portions thereof were invested in Intel target date funds ("Intel TDFs"); and (2) participants in the Plans whose accounts or portions thereof were invested in the Intel Global Diversified Fund ("IGD Fund"). Plaintiff's accounts in the 401(k) Plan were invested in the Intel Target Date 2035 Fund ("Intel 2035 TDF") and the Intel Target Date 2045 Fund ("Intel 2045 TDF").[2] Plaintiff's account in the Retirement Plan was invested in the IGD Fund.

---

[1] The predecessor to both the 401(k) Plan and the Retirement Plan was the Intel Corporation Profit-Sharing Retirement Plan, which was established in 1979 and amended in 1996 to be split into the two plans at issue in this case.

[2] The various asset classes into which the Intel TDFs and the Diversified Fund were allocated are referred to herein as the "Investment Classes."

COMPLAINT
*Florence Lo v. Intel Corporation, et al*
1

3.      The Intel Investment Policy Committee ("Investment Committee") was and is the fiduciary for both Plans and was and is responsible for selecting, managing, and monitoring the Plans' investments. The Investment Committee is appointed by the Finance Committee of the Intel Corporation Board of Directors (the "Finance Committee"), and is responsible for monitoring the performance of the Investment Committee.

4.      The Investment Committee, having been delegated the responsibility to manage the investment of the Retirement Plan assets and designate and manage the investment choices available to 401(k) Plan participants, assumed the responsibility for creating a series of custom funds as investment choices for the 401(k) Plan. Those custom funds were organized as collective investment trusts ("CITs") and were held within the Intel Corporation Retirement Plans Master Trust. The Investment Committee also assumed the responsibility for creating a single custom fund that for most of the relevant period was the only investment fund available for most Retirement Plan participants. These CITs were available as investment choices only to participants in the Intel Plans. The Investment Committee hired various investment managers to manage a portion of the assets of each of these CITs and allocated the assets of the CITs among those investment managers. The CITs include the Stable Value Fund, the Global Bond Fund, the US Small Cap Stock Fund, the US Large Cap Stock Fund, the International Stock Fund, the Alternative Investments Fund, the Commodities Fund, the Hedge Fund, and the Emerging Markets Fund.

5.      The Investment Committee also assumed overall responsibility for creating a series of custom Target Date Funds by creating twelve different asset allocation models using the CITs. The Investment Committee determined the varying percentages of each Target Date Fund that would be allocated among the underlying CITs to create a level of risk that the Investment Committee deemed appropriate for someone reaching age 65 in the year specified in the name of each Target Date Fund. For example, the Intel 2045 Fund would have a risk profile deemed appropriate for someone reaching age 65 in 2045, and would have a greater percentage of its assets allocated to the CITs that invested in domestic and international equities and a

smaller percentage invested in Stable Value and bond funds than would the Intel 2020 Fund.

6.     In a similar fashion, The Investment Committee assumed overall responsibility for creating a custom balanced fund, the IGD Fund, by creating a single asset allocation model using the CITs as the underlying investment funds. The Investment Committee made its own determination about what percentage of the IGD Fund would be invested in each of the underlying CITs.

7.     Generally speaking, target date funds are designed to allow retirement plan participants to invest in a single fund with a professionally-managed, broadly diversified portfolio that becomes more conservative as the participant approaches retirement age. The investment strategy of each fund is based on a level of risk generally deemed appropriate for someone who expects to retire in the year of the fund's target date. The investment strategy assumes greater risk in the fund's early years and grows more conservative over time. For example, in the early years when investors have more time to bear short-term fluctuations in the stock market, each fund's asset allocation favors stocks to try to maximize returns. Then as the "target date" nears, money gradually is moved out of stocks and into more conservative investments, like bonds, to try to preserve the accumulated value of investors' accounts. Target date funds are designed for participants who do not want to create their own asset allocations using the plan's designated investment choices – but prefer the "set-it-and-forget-it" approach offered by target date funds that essentially provide professional asset allocation advice.

8.     The Intel TDFs are not actual funds and do not exist as separate registered investment companies (mutual funds) or CITs. Instead, they are nothing more than twelve asset allocation models, designated as Target Date 2005, Target Date 2010, Target Date 2015, Target Date 2020, Target Date 2025, Target Date 2030, Target Date 2035, Target Date 2040, Target Date 2045, Target Date 2050, Target Date 2055, and a Target Date Income Fund. Those models invest participants' accounts in the CITs in varying percentages, as determined by the Investment Committee, to achieve a level of risk that the Investment Committee deems commensurate with the needs of an individual whose expected normal retirement date is during

or within two years of the year included in the name of the Target Date Fund. The separate asset allocations for each Target Date Fund are described in an Intel publication titled "Target Date Funds."

9.     The IGD Fund also is an asset allocation strategy rather than an actual fund in and of itself. The IGD Fund is "balanced" in the way a "balanced fund" is balanced, meaning that the assets of the fund are invested in a diversified mix of equity and fixed-income investments designed to achieve a target level of risk that is appropriate for the population of the plan as a whole rather than for any narrow age group. See 29 C.F.R. § 2550.404c-5(e)(4)(ii). The IGD Fund was allocated among the CITs in percentages selected by the Investment Committee.

10.     The terms of the Retirement Plan ***required that all participant accounts***, including Plaintiff's accounts, be invested in the IGD Fund until the participant reached age 50, at which time the participant could elect to invest his or her account in the IGD Fund, the TDFs, the Stable Value Fund or any combination of those funds. Like the Intel TDFs, the IGD Fund allocated participant accounts among the CITs. Thus, all funds ultimately were invested in the CITs.

11.     If participants selected the TDFs for investment, their accounts were invested in the CITs under the asset allocations designated by the Investment Committee for each of the Intel TDFs. The Investment Committee also designated the percentage of the IGD Fund that would be invested in each of the CITs. The Investment Committee, not the Plans and their participants, chose the CITs, selected the investment managers for each of the CITs, and determined what percentage of each asset allocation model and the IGD Fund would be invested in the each of the CITs.

12.     Through at least the first quarter of 2015, the Investment Committee was responsible for choosing the asset allocation models and "Investment Funds"—as defined and explained in paragraphs 45h and 85, below—for the Intel TDFs and the IGD Fund.

13.     Beginning in 2011, the Investment Committee dramatically altered the asset

allocation model for the Intel TDFs by increasing Intel TDF investments in hedge funds from about $53 million on Jan. 1, 2011 to nearly $685 million on December 31, 2011, a nearly 13-fold increase.

14.     Similarly, during the period from 2011 through 2014, the Investment Committee increased the Retirement Plan's investment in hedge funds *more than seven-fold*, from about $228 million to $1.6 billion.

15.     During this same period, the Investment Committee continued to allocate between $300 million and $400 million to the Commodities Fund, which has had consistent investment losses every year since 2011.

16.     The Investment Committee's imprudent allocations to hedge funds, private equity and commodities represented a substantial departure from generally accepted asset allocation models for target date funds, and exposed the Plans and their participants to significant investment, liquidity and valuation risks in addition to hugely excessive fees.

17.     Due to the Investment Committee's decisions, the Plans and their participants have suffered hundreds of millions of dollars in losses during the six years preceding the filing of this Complaint as compared to what they would and should have earned if they had been invested in asset allocation models that were consistent with prevailing standards for investment experts and prudent fiduciaries.

18.     The Intel TDFs have underperformed peer TDFs by approximately 200 basis points (i.e., two percentage points) annually,[3] a differential that is devastating over time. The aggregate value of participant accounts invested in the Intel TDFs alone was estimated in June 2015 to be approximately $3.63 billion.[4] Underperformance by two percentage points on $3.63

---

[3] The term "basis point" means one hundredth of one percent, or 0.01%. This term sometimes is abbreviated as "BPs," and is pronounced "bips." This is a standard term used in finance and the insurance industry. *See* Investopedia, *What is a basis point?*,
http://www.investopedia.com/ask/answers/05/basispoint.asp (last visited Jan. 26, 2016).
[4] "Robert Steyer, *Intel hires manager for target-date, global funds*, Pensions & Investments (June 15, 2015), *available at*
http://www.pionline.com/article/20150615/PRINT/306159980/intel-hires-manager-for-target-

billion of assets – more than $72 million per year – has resulted in investment shortfalls of hundreds of millions of dollars compared with the amount that the Intel TDFs would have earned had they been prudently invested since 2011, when the Investment Committee dramatically increased the Intel TDFs' and the IGD Fund's allocations to hedge funds and retained the poorly-performing investments in commodities.

19.     The IGD Fund also has significantly underperformed balanced funds that have a more traditional approach to investing. In an article published in The Oregonian on August 24, 2014[5], Brent Hunsberger compared the investment return on the IGD Fund to the performance of the Vanguard LifeStrategy Moderate Growth Fund (Ticker: VSMGX), which outperformed the IGD Fund by at least 170 basis points (1.70%) over the preceding one-year, three-year, five-year and ten-year performance periods. As of June 2015, the Retirement Plan had **nearly 90% of its assets** ($5.82 billion out of a total of $6.66 billion) invested in the IGD Fund. The IGD Fund's underperformance is largely due to its excessive allocations to hedge funds, commodities and private equity, which exceeded $2.63 billion as of the end of 2014 – **nearly 40% of total Retirement Plan assets**.

20.     The following chart isolates the effect of the alternative investment on the returns of the IGD Fund. The Table compares the actual return of the IGD Fund, including its alternative investments, to the hypothetical return of a portfolio (the Traditional Portfolio Benchmark) that was invested in the benchmark for the asset classes in which the IGD Fund was invested, and in the same proportions as the IGD Fund, but without any allocation to the alternative investments. The calculation demonstrates the underperformance caused by the

---

dateglobal-funds (last visited Jan. 26, 2016) ("Intel Corp. moved to external management for two big investment options that house all of the alternative investments in its $14.85 billion defined contribution plans.").

[5] Hunsberger, Brent, *What's inside Intel's retirement plans. Hedge funds. Lots of 'em.*, The Oregonian (Aug. 30, 2014), *available at*
http://www.oregonlive.com/finance/index.ssf/2014/08/whats_inside_intels_retirement.html (last visited Jan. 26, 2016).

| Traditional Portfolio Without Alternative Investments Compared to Intel Allocation With Alternatives | | | |
|---|---|---|---|
| | 1 Year | 5 Year | 10 Year |
| Traditional Portfolio Benchmark | 5.11% | 8.72% | 6.53% |
| Global Diversified | 6.04% | 7.52% | 4.34% |
| Performance Differential | 0.93% | -1.20% | -2.19% |

alternative investments: 2.19% per year, year-over-year, for a ten-year performance period.

21.     Additionally, the Administrative Committee (described in paragraph 41, below) was responsible for ensuring that Plan participants be provided with a general description of the investment objectives, risk-and-return characteristics, and fees and expenses of each investment alternative available under the Plans, including information relating to the type and diversification of assets comprising the portfolio of each designated investment alternative.

22.     But the Administrative Committee failed to disclose adequately to participants the risks, fees and expenses associated with investing in hedge funds, commodities and private equity. The only information it provided about these investments stated simply that there were hedge fund and private equity investments. Defendants also failed to include disclosures of fee and expense information on the Plans' and the underlying funds' annual returns filed with the Department of Labor on Form 5500, which are required by federal regulations. The information that was provided could not be considered sufficient to enable Plaintiff and the proposed Class to make informed investment decisions or effectively exercise control over the investment of their accounts.

23.     Thus, Plaintiff alleges on behalf of the Plans and the Classes that: (1) the Investment Committee has breached its fiduciary duties under ERISA § 404(a) in managing 401(k) Plan and Retirement Plan assets, particularly in connection with the Intel TDFs and the IGD Fund; (2) Intel Corporation and the Finance Committee have breached their duties under ERISA Section 404 by failing to monitor and supervise the activities of the Investment

Committee adequately; and (3) Intel Corporation and the Administrative Committee have breached their duties under ERISA Section 104 and 404 by failing to file complete and accurate Annual Returns and failing to provide plan-related and investment-related disclosures to a class of participants in the Plans whose accounts were invested in Intel TDFs from 2011 to the present, and a class of participants in the Plans whose accounts were invested in the IGD Fund from 2009 to the present. Further, Intel Corporation and the Administrative Committee have engaged in prohibited transactions.

## II.   JURISDICTION AND VENUE

24.   This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

25.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

26.   Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because, upon information and belief, most if not all of the individual defendants can be found in this District.

27.   **Intradistrict Assignment**. Assignment to the San Jose Division is appropriate because Intel's headquarters, where much of the complained-of conduct occurred, are located in Santa Clara County.

## III.   PARTIES

### A. Plaintiff

28.   Plaintiff Florence Lo is a former employee of Intel Corporation and is a resident of El Dorado Hills, California. Ms. Lo worked for Intel until October 2015. While employed at Intel, Ms. Lo was a participant, within the meaning of ERISA § 3(7), in the Intel Retirement Contribution Plan (previously short-titled as the "Retirement Plan" and formerly known as the Intel Retirement Plan) and a participant in the Intel 401(k) Savings Plan (previously short-titled as the "401(k) Plan"). Due to her years of employment, Ms. Lo is fully vested in her account

balances in both the 401(k) Plan and the Retirement Plan. The entirety of her Retirement Plan account was invested in the IGD Fund. Her 401(k) Plan account was invested 81% in the Intel 2035 TDF, 18.5% in the Stable Value Fund, and 0.5% in the Intel Stock Fund. Ms. Lo is and continues to be a participant in both the Retirement Plan and the 401(k) Plan.

**B. Defendants**

**1. Corporate Sponsor and Named Fiduciary Defendant**

29.     **Intel Corporation.** Intel Corporation is a multinational technology company headquartered in Santa Clara, California and is one of the world's highest-valued and, based on revenue, largest semiconductor chip makers. According to its 2014 Annual Report, Intel had more than 106,000 employees worldwide as of December 29, 2014, with approximately 51% of those employees located in the United States. Intel employs large numbers of workers in California, Colorado, Massachusetts, Arizona, New Mexico, Oregon, Texas, Washington and Utah.

**2. Intel Finance Committee Defendants**

30.     **The Intel Finance Committee** consists of members of the Intel Board of Directors, is a named fiduciary to the Plans and is responsible for appointing, monitoring, and removing the members of the Investment Committee and the Retirement Plans Administrative Committee under Section 13(b) of the Plan Document for each of the Plans. Under Section 13(b), the Finance Committee can remove any member of the Administrative Committee or the Investment Committee at will "with or without cause" and can appoint any successor member. Each member of the Finance Committee also is a fiduciary to the Plans. The members of the Finance Committee during the relevant period are referred to as the "Finance Committee Defendants."

31.     **Charlene Barshefsky** has been a member of Intel's Board of Directors since 2004, has been a member of the Finance Committee continuously since 2007, and has served as the Chair of the Finance Committee since 2009. Ms. Barshefsky currently is a Partner at the law firm of Wilmer Hale, where she is the chair of the International Trade, Investment and Market

Access Practice Group. She serves on the Boards of Directors of American Express Company, The Estee Lauder Companies Inc., and Starwood Hotels & Resorts Worldwide, Inc.

32.    **Susan L. Decker** has served on Intel's Board of Directors since 2004, and served on the Finance Committee between 2009 and 2011. She was Intel's Chief Financial Officer from 2000 to 2007, and then President of Yahoo! Inc. from June 2007 to April 2009. Susan L. Decker lives in San Francisco, California.

33.    **John J. Donahoe** has served on Intel's Board of Directors since 2009 and served on the Finance Committee in 2009. He worked as managing director of Bain & Company since 1982, becoming the firm's president and Chief Executive Officer ("CEO") in 1999. He became the president of eBay in March 2005, and has been CEO of eBay since March 31, 2008. He is a Member of the Advisory Board and Director of eVolution Global Partners, LLC, a global venture capital firm that specializes in early stage investments within the information technology and media sectors. Since 2009, he has been a Director of Skype Global S.a.r.l. and an Independent Director of Nike, Inc. since 2014. John J. Donahoe lives in Portola Valley, California.

34.    **Reed E. Hundt** has been a member of Intel's Board of Directors since 2001 and a member of the Finance Committee since 2010. Mr. Hundt practiced law at Latham & Watkins from 1975 to 1993. He has been an advisor to the private equity firm Blackstone Group since 2010. He also is a Principal at REH Advisors, a business advisory firm.

35.    **James D. Plummer** has been a member of Intel's Board of Directors since 2005 and a member of the Finance Committee since 2006. James Plummer lives in Portola Valley, California. He is also a professor and the Dean of the School of Engineering at Stanford University in Stanford, California.

36.    **Frank D. Yeary** has been a member of Intel's Board of Directors since 2009 and a member of the Finance Committee since 2009. Mr. Yeary is an international investment banker. Before 2004, he served as the global head of the Technology, Media and Telecom investment banking practice at Salomon Smith Barney. According to his Linked-in Profile,

Frank D. Yeary lives in the San Francisco Bay Area and is co-founder and the Executive Chairman of CamberView Partners, a San Francisco advisory firm.

### 3. Investment Committee Defendants

37.     **Intel Retirement Plans Investment Policy Committee**. Under ERISA § 402(a) (29 U.S.C. § 1102(a)) and section 13(a) of the Plans, the Investment Committee is a named fiduciary for the Plans with respect to the management and control of the Plans' assets. Under Section 13(a) of the Plans, the Investment Committee and its members are responsible for asset management; designating and evaluating the investment alternatives offered to participants in the Plans; and managing and controlling the Plans' assets. The Investment Committee also has the authority to appoint and remove the Trustees for the Plans, as well as to appoint and remove one or more investment managers for the Plans. Each member of the Investment Committee also is a de facto fiduciary to the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because each exercised discretionary authority or discretionary control with respect to management of the Plans and exercised authority or control with respect to management or disposition of the Plans' assets. The members of the Investment Committee during the relevant period are referred to as the "Investment Committee Defendants."

38.     **Ravi Jacob** has been a member of the Investment Committee since at least as far back as January of 2010. He also is a corporate vice president and the treasurer of Intel Corporation. As treasurer, Mr. Jacob manages Intel's cash and investments, capital markets activity, currency and other financial risks, credit and collections, retirement assets and risk and insurance. Ravi Jacob lives in the San Francisco Bay Area.

39.     **David S. Pottruck** has been a member of Intel's Board of Directors since 1998. He has served as the Chairman of the Investment Committee since at least 2009. Mr. Pottruck served in various senior executive positions at Charles Schwab Corp. from 1984 to 2004: President (6/1992-7/20/2004), COO (1994-09/1998), Co-CEO (1/1998) and CEO (5/9/2003-7/20/2004). He is the CEO and Chairman of Red Eagle Ventures, a Director of Joyent, Inc., a Director of Serve Virtual Enterprises, Inc., and Chairman of the wealth management firm

HighTower Advisors, LLC. Mr. Pottruck also is a Senior Fellow and adjunct faculty member at the Wharton Center for Leadership & Change Management. According to his Linked-In Profile, David S. Pottruck lives in the San Francisco Bay Area.

40.     **Does 1-20** are persons serving on the Investment Committee during the relevant period whose identities are unknown to Plaintiff. None of the disclosures provided to Plaintiff names all of the members of the Investment Committee and, for that reason, they are named as Does 1-20. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

### 4.  Administrative Committee Defendants

41.     **Administrative Committee**. The Administrative Committee is a named fiduciary with respect to the operation and administration of the Plans (except with respect to management or control of the Plans' assets) under Section 13(a) of both Plan Documents. The Committee and its individual members (collectively "Administrative Committee") were and are named fiduciaries for the 401(k) Plan and the Retirement Plan with respect to the operation and administration of the Plans. Under Section 13(e), the Administrative Committee was and is responsible for preparing and furnishing to participants a general explanation of the Plans and all other information required to be furnished to participants under federal law or the Plans, including disclosures regarding designated investment alternatives.

42.     **Does 21-40** are persons who served on the Administrative Committee during the relevant period and whose identities are unknown to Plaintiff. None of the disclosures provided to Plaintiff names any of the members of the Administrative Committee; thus, they are named as Does 21-40. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

### C.  Relevant Non-Parties

43.     **The Intel Minimum Pension Plan.** The Intel Minimum Pension Plan, formerly known as the Intel Defined Benefit Pension Plan (the "DB Plan"), is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The DB Plan and the Retirement

Plan operate as what is known as a "floor offset" arrangement, in which the amount of the benefit provided by the DB Plan is reduced by the value of the benefit provided by the Retirement Plan. The DB Plan provides a benefit only to the extent that a participant's account in the Retirement Plan is less than a specified amount. The Plan Sponsor of the DB Plan within the meaning of ERISA § 3(16)(B) is Intel Corporation.

44. **State Street Bank and Trust Company, Trustee ("State Street").** State Street is a trust company organized under Massachusetts law. Effective January 1, 2010, State Street became the trustee for the Plans and the Master Trust and thereafter held all of the assets of the Master Trust directly. State Street, as trustee, is a fiduciary to the Plans.

## IV.   TERMINOLOGY

45. Certain terms of art in the retirement investing industry are used repeatedly throughout this Complaint. In addition to defining those terms in context where appropriate, those terms also are defined here as they are used herein:

   a. **Defined Benefit plan**: A type of retirement plan that provides a fixed, pre-established benefit for employees at retirement. Employers are responsible for funding the plan and therefore the investment risk in a defined benefit plan is borne by the employer rather than the employees. *See* Dept. of Labor, *Types of Retirement Plans*, *available at* http://www.dol.gov/general/topic/retirement/typesofplans (last visited Jan. 29, 2016).

   b. **Defined Contribution plan**: A type of retirement plan with individual accounts for each employee, funded regularly by employee contributions that are invested on their behalf. At retirement the employee receives the balance of his or her account, adjusted for any investment gains or losses. A 401(k) plan is a type of defined contribution plan. In a defined contribution plan, the investment risk is borne by the individual employee on whose behalf the funds in the account are invested. *Id.*

c.  **Intel Corporation Profit-Sharing Retirement Plan ("the Profit Sharing Plan")**: A profit-sharing plan established by Intel for its employees in 1979. The Profit Sharing Plan was the predecessor to the Plans at issue in this case, and was bifurcated in 1996 into the Intel 401(k) Savings Plan and the Intel Retirement Contribution Plan.

d.  **Intel 401(k) Savings Plan** (the "401(k) Plan"): a 401(k) retirement savings plan to which Intel employees can make salary deferral contributions, share in discretionary contributions made by Intel and direct the investment of their accounts among the available Investment Funds. The terms of the 401(k) Plan are set forth in the January 2014 401(k) Plan Document.

e.  **January 2014 401(k) Plan Document**: A filed document that describes the terms of the investment mechanics and operations of the 401(k) Plan. This document was amended and restated in January 2014.

f.  **Intel Retirement Contribution Plan** (the "Retirement Plan"): a defined contribution retirement plan to which only employer contributions are made. The Retirement Plan works in conjunction with the Intel Minimum Pension Plan, which provides a defined benefit pension to Intel employees hired before January 1, 2011. The benefit obligations of the Intel Minimum Pension Plan are reduced by the value of a participant's account in the Retirement Plan. Until 2015, most participants in the Retirement Plan did not have the ability to choose how their Retirement Plan account was invested. Instead, their accounts were invested automatically in the IGD Fund. The terms of the Retirement Plan are set forth in the 2014 Retirement Plan Document.

g.  **January 2014 Retirement Plan Document**: A filed document that describes the terms of the investment mechanics and operations of the Retirement Plan. This document was amended and restated in January 2014.

h.  **Investment Funds**: The designated underlying investments for the Plans, each

of which is set up as a collective investment trust ("CIT"). The CITs at issue in this case are also sometimes referred to internally as "Master Trusts", and are sometimes referred to as such in this complaint. The assets of the CITs are managed by multiple managers selected by the Intel Investment Committee. The CITs include the Stable Value Fund, the Global Bond Fund, the US Small Cap Stock Fund, the US Large Cap Stock Fund, the International Stock Fund, the Alternative Investments Fund, the Commodities Fund, the Hedge Fund, and the Emerging Markets Fund.

i.   **Asset Allocation Fund**: A portfolio which consists of a diverse set of asset classes such as equities, bonds, and international securities, and may be structured as a "fund of funds" or invest directly in securities representative of the asset classes.

j.   **Balanced Fund**: An asset allocation fund that is invested in a diversified set of asset classes such as equities, bonds, and international securities that is considered to be an appropriate asset mix for all participants in the plan as a whole. The asset allocation of a balanced fund does not change over time.

k.   **Target Date Fund ("TDF")**: An asset allocation fund designed to invest in a diverse pool of assets that have a risk profile generally considered appropriate for an investor who will turn age 65 in or near the year in the title of the target date fund. For example, the Target Date 2040 Fund should have an asset mix of stocks and bonds that have an aggregate level of investment risk appropriate for an individual who will turn age 65 in 2040. As the "target date" nears, money is gradually moved out of stocks and into more conservative investments, like bonds, to try to preserve the accumulated value of investors' accounts. Typically, a TDF series or family will be invested in the same underlying assets; the allocations of those assets in each TDF (e.g. the mix of equities versus bonds or fixed income instruments) will change as the titled "target date" approaches. For

example, a TDF 2040 Fund and a TDF 2020 Fund typically would be invested in the same underlying assets, but the 2020 fund ostensibly would have a more conservative mix of investments because it should be appropriate for participants who are expected to retire twenty years sooner than the participants who are expected to invest in the 2040 Fund. Rather, the Intel TDFs were invested in varying percentages in the Investment Funds. It is important to note here that although Intel created TDFs for its employees to invest in, they are not technically standalone funds. The Intel TDFs are just asset allocation mixes of the Investment Funds on a glide path to retirement, in that way like a traditional TDF, but without each TDF operating with its own assets as a standalone entity.

l. **The Intel Global Diversified Fund (the "IGD Fund")**: A balanced fund designed to be appropriate for the participants in the Retirement Plan considered as a whole. The assets of the IGD Fund are allocated among the Investment Funds in percentages determined by the Investment Committee. In general, that asset allocation does not change over time.

## V.    CLASS ALLEGATIONS

46.    Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

a.    All participants in the Intel Retirement Contribution Plan and the Intel 401(k) Savings Plan whose accounts were invested in any of the Intel Target Date Funds at any time during the period from 2011 through the present (the "Target Date Class");

b.    All participants in the Intel Retirement Contribution Plan and the Intel 401(k) Savings Plan whose accounts were invested in the Intel Global Diversified Fund at any time during the period from 2009 through the present (the "IGD Fund Class").

47.    Excluded from the Classes are the following persons: (a) all of the Defendants,

(b) all fiduciaries of the Plans; (c) all officers and directors of Intel; and (d) all members of the immediate family of and all heirs, successors and assigns of any such excluded party.

### A. Numerosity and Impracticability of Joinder

48. The size and geographic diversity of the Classes make joinder of all class members impracticable. The 2014 Form 5500 filed with the Department of Labor (the most recent one filed) states that the 401(k) Plan had 63,518 participants and/or beneficiaries. The 2014 Form 5500 filed with the Department of Labor (also the most recent one filed) states that the Retirement Plan had 50,718 participants and/or beneficiaries. The IGD Fund was ***the only available investment*** for any Retirement Plan participant who was not yet 50 years old. Further, Intel's website states that Intel has locations in Arizona, California, Colorado, the District of Columbia, Idaho, Illinois, Kentucky, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington and Wisconsin. Thus, the Classes are both large and geographically dispersed.

49. The Target Date Class satisfies the numerosity requirement because it includes thousands of persons in numerous locations. In 2014, Stuart Odell, Assistant Treasurer of Retirement Investments at Intel, estimated that 50% of the then-$7.4 billion in assets in the 401(k) Plan were invested in the Intel TDFs, and that approximately 60% of the Plan's 63,000 participants had at least some portion of their accounts invested in the TDFs[6] and, therefore, necessarily held interests in the Hedge and Private Equity Funds. During the Target Date Class Period, many participants were defaulted into an Intel TDF. The number of Class members is so large that joinder of all its members is impracticable.

50. The IGD Fund Class satisfies the numerosity requirement because it includes thousands of persons in dozens of geographically dispersed locations. The accounts of participants in the Retirement Plan under age 50 were invested automatically in the IGD Fund.

---

[6] PIMCO DC Dialogue, Volume 9, Issue 3, Interview with Stuart Odell, *available at* http://media.pimco.com/Documents/PIMCO_DC_Dialogue_Odell_Schaus_Mar_Apr_2014.pdf [hereinafter *Odell Interview*].

During the IGD Fund Class Period (2009 to present), approximately 87% of Retirement Plan assets were invested in the IGD Fund. Therefore, virtually all of the Retirement Plan's participants, tens of thousands of persons, were invested in the IGD Fund. The number of Class members is so large that joinder of all its members is impracticable.

**B. Commonality**

51.    Plaintiff's claims raise common questions of law and fact for both Classes including:

a.   Whether the Investment Committee's fiduciary duties included selecting and managing the Plans' assets;

b.   Whether the selection, management and allocation of the underlying funds by the Investment Committee regarding the Intel TDFs and the IGD Fund were prudent; and

c.   Whether Intel Corporation and the Finance Committee adequately monitored and supervised the activities of the Investment Committee.

52.    Common questions of law and fact regarding the Target Date Class include:

a.   Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in constructing and managing the Intel TDFs;

b.   Whether the Intel TDF asset allocation models chosen by the Investment Committee for the Plans imprudently deviated and continue to deviate imprudently from asset selection and asset allocations that are appropriate for target date funds;

c.   Whether the Investment Committee imprudently selected and managed the underlying funds to which the Intel TDFs allocated the Plans' assets in breach of the Committee's fiduciary responsibility;

d.   Whether the Plans and their participants suffered losses because of the Investment Committee's fiduciary breaches; and

e.   Whether the Administrative Committee breached its fiduciary duties to the Plans

1    and their participants by failing to make adequate disclosures about the Intel

2    TDFs and the underlying investments.

3        53.    Common questions of law and fact with respect to the IGD Fund Class

4    include:

a. Whether the Investment Committee breached its fiduciary duties to the Plans and
   their participants in constructing and managing the IGD Fund;

b. Whether the asset allocation model chosen by the Investment Committee for the
   IGD Fund imprudently deviated and continues to deviate imprudently from asset
   selection and asset allocations that are appropriate for balanced funds;

c. Whether the Investment Committee Defendants imprudently selected and
   managed the underlying funds to which the IGD Fund allocated the Plans' assets;

d. Whether the Plans and their participants suffered losses because of the
   Investment Committee Defendants' fiduciary breaches; and

e. Whether the Administrative Committee breached its fiduciary duties to the Plans
   and their participants by failing to make adequate disclosures about the IGD
   Fund and the Investment Funds.

**C. Typicality**

54.    Plaintiff's claims are typical of the claims of the Classes because her claims arise from the same events, practices and/or course of conduct as other members of the Classes. Plaintiff's claims challenge whether the fiduciaries of the Intel Plans acted consistently with their fiduciary duties and whether their breaches caused losses or otherwise harmed the Plans and their participants. These are claims common to and typical of other Class members. Moreover, these claims seek recovery on behalf of the Plans.

**1. Target Date Class**

55.    As with all participants in the Plans whose accounts were invested through an Intel TDF, the Investment Committee chose

– each asset class in which the funds would be invested,

– the percentages of each TDF that would be invested in each of the underlying asset classes,

– all of the investment managers and

– all of the sectors representing the selected asset classes for every Intel TDF, including the Intel 2035 TDF in which Ms. Lo invested.

56.     Plaintiff's claims also are typical of the claims of the Target Date Class because, like the claims of all members of that Class, her claims arise from the Administrative Committee's failure to provide complete and adequate disclosures to her regarding the Intel TDFs.

### 2.  IGD Fund Class

57.     As is true of all participants in the Plans whose accounts were invested through the IGD Fund, the Investment Committee chose the asset allocation model, the asset Classes, and the funds representing the selected asset Classes for the IGD Fund in which Ms. Lo's Retirement Plan account was invested. Plaintiff's claims also are typical of the claims of the IGD Fund Class because, like the claims of all members of the Class, her claims arise from the Administrative Committee's failure to provide complete and adequate disclosures to her regarding the IGD Fund.

### D.  Adequacy

58.     Plaintiff will fairly and adequately protect the interests of the Target Date Class. She is committed to the vigorous representation of the Class.

59.     Plaintiff will fairly and adequately protect the interests of the IGD Fund Class. She is committed to the vigorous representation of the Class.

60.     Defendants do not have any unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Classes.

61.     Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

### E.  Rule 23(b)(1)

62.     The requirements of Rule 23(b)(1)(A) are satisfied in this case. Fiduciaries of

ERISA covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act uniformly in the best interests of the Plans and their participants. As this action challenges whether Defendants acted consistently with their fiduciary duties to the Plans, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the fiduciaries of the Plans.

63.     This case satisfies the requirements of Rule 23(b)(1)(B). Administration of an ERISA plan requires that all similarly situated participants be treated consistently. Indeed, that is a fundamental purpose of ERISA. As such, whether Defendants fulfilled their fiduciary obligations with respect to the Plans and the Plans' participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**F.   Rule 23(b)(2)**

64.     This case meets the requirements of Rule 23(b)(2). Defendants have applied the same or substantially similar investment policies and investment options in the Plans that cover all members of the Classes. The breaches alleged against Defendants with respect to the Target Date Class and the IGD Fund Class relate to policies that applied to, respectively, all members of the Target Date Class and all members of the IGD Fund Class. Thus, Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole.

65.     The primary relief sought on behalf of the Classes is a determination that Defendants breached their fiduciary duties, a determination of the amount by which those breaches adversely affected the Plans rather than individual members of the Classes, and a consequent order requiring Defendants to make good those losses to the Plans. Such relief is accomplished by issuance of a declaration or an injunction and, therefore, the primary requested relief constitutes final injunctive or declaratory on behalf the Classes with respect to the Plans.

**G.   Rule 23(b)(3)**

66.     This case also meets the requirements of Rule 23(b)(3). The common questions

of law and fact concern whether Defendants breached their fiduciary duties to the Plans. Because Class members are those participants whose accounts were invested in the affected investments, common questions related to liability necessarily will predominate over individual questions. Similarly, as relief will be on behalf of and will flow to the Plans, common questions related to remedies and relief likewise will predominate over individual issues.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by many of the individual members of the Classes are likely small, particularly in relation to the cost of pursuing investment-related litigation, and it therefore would be impractical for individual members to bear the expense and burden of individual litigation to enforce their rights. The fiduciaries of the Plans have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA; thus, the members of the Classes have an interest in having this action proceed in a single action. No Class member has an interest in individually controlling the prosecution of this matter.

68.     This District is the most desirable forum for concentration of this litigation because (1) Intel is headquartered in this District; (2) a number of the actions challenged by this Complaint took place in this District, chiefly, on information and belief, Investment Committee and Administrative Committee meetings; (3) the Plans are administered in or near this District; (4) many of Intel's employees are located in or near this District; and (5) many of the Intel employees who are named as Defendants can be found in this District.

69.     Given the nature of the allegations, there are no difficulties likely to be encountered in the management of this matter as a class action.

## VI.     FACTUAL ALLEGATIONS

### A.  The Plans

70.     The Plan Documents for the Retirement Plan and the 401(k) Plan recite that the Intel Corporation Profit-Sharing Retirement Plan ("the Profit Sharing Plan") was established in 1979 and is the predecessor plan of both the Retirement Plan and the 401(k) Plan. The Profit

Sharing Plan was amended and restated effective on January 1, 1984 to permit Eligible Employees to contribute to the Plan through salary deferrals. Effective January 1, 1996, the Profit Sharing Plan was bifurcated into two separate plans, the 401(k) Plan and the Retirement Plan.

71.   The Retirement Plan was amended and restated effective January 1, 2011. Among other changes, the 2011 amendments limited participation in the Plan to those employees who were hired before January 1, 2011. The January 2014 Retirement Plan Document is the most current version of the documents that govern or have governed the Retirement Plan.[7]

72.   The 401(k) Plan also was amended and restated effective January 1, 2011. Among other changes, the 2011 amendments added Employer Contribution Accounts generally: (a) for employees who were hired on or after January 1, 2011, and (b) to hold discretionary contributions made on behalf of certain other employees above a specified pay-grade level. The January 2014 401(k) Plan Document is the currently operative version of the documents that govern or have governed 401(k) Plan.

## 1.  Intel Retirement Plan

*Participation*

73.   Section 3(a) of the January 2014 Retirement Plan Document provides that Eligible Employees are automatically enrolled in the Plan as soon as they become eligible to participate. Effective January 1, 2011, the Retirement Plan was closed to new participants, but still covers eligible employees hired before January 1, 2011. According to the 2014 Form 5500, the Retirement Plan had 48,787 participants entitled to benefits and $6,722,726,892 in total

---

[7] It is important to distinguish between the retirement plans themselves and the filed documents that govern their investments. For example, the 401(k) Plan currently is governed by a document filed in January 2014 that also is called the 401(k) Plan. The same is true of the Retirement Plan. For ease of reference herein, references to the plans themselves (e.g., as financial entities) will use the proper or short-titled names of the Plans, and the documents that govern them will be referred to by their dates and will append the term "Document." For example, the January 2014 401(k) Plan Document refers to the filed plan document that governs the 401(k) Plan.

assets as of December 31, 2014.

*Contributions*

74.     Section 4(a) of the January 2014 Retirement Plan Document provides that Intel will make discretionary contributions to the Plan in such amounts as the Intel Board of Directors determines in its sole and absolute discretion. Eligible Employees do not and did not contribute to the Retirement Plan.

*Vesting*

75.     From the beginning of the IGD Fund Class Period until January 1, 2015, the Retirement Plan accounts of participants under age 50 were invested automatically in the IGD Fund.

76.     Effective January 1, 2015, participants in the Retirement Plan were allowed to elect to have their accounts in the Plan invested in whatever funds or portfolios the Investment Committee determined to make available as investment choices.

**2.   Intel 401(k) Plan**

*Eligibility*

77.     The Summary Plan Description ("SPD") for the 401(k) Plan provides that all regular US employees of Intel, with certain exceptions, are eligible to participate in the 401(k) Plan. Eligible Employees hired on or after January 1, 2011 are enrolled in the Plan automatically 45 days after their hire date. According to the 2014 Form 5500, the 401(k) Plan had 62,838 participants with account balances and $7,895,030,553 in total assets as of December 31, 2014.

*Contributions*

78.     The SPD provides that an Eligible Employee may elect to contribute between 1% and 50% of eligible compensation to the Plan as a pre-tax deferral.

79.     Starting in 2007, Intel began automatically enrolling employees who were eligible to participate in the 401(k) Plan but who had not yet enrolled, unless they opted out by affirmatively so-electing during a forty-five day opt-out period. Automatically-enrolled

participants were deemed to have elected to contribute 3% of their regular earnings to their 401(k) Plan accounts unless they affirmatively elected otherwise. This contribution then automatically increased by one percentage point each successive year, up to a maximum deferral of 10% of the participant's pre-tax earnings.

80.    Under the current terms of the Plan, employees hired on or after January 1, 2013 were enrolled automatically and deemed to have elected to contribute 6% of their regular earnings to their 401(k) Plan accounts unless they affirmatively elected otherwise. This contribution then automatically increased by two percentage points each successive year, up to a maximum deferral of 16% of the participant's pre-tax earnings.

*Investment of Plan Assets*

81.    401(k) Plan participants may invest in the Funds established by the Investment Committee in such amounts as the participants elect.

82.    Participants in the 401(k) Plan who are enrolled in the Plan automatically under Section 3(a) and fail to make an affirmative investment election for their accounts are automatically invested ("defaulted") into the Intel TDF with a target date that is closest to the year in which the participant will turn 65.

83.    In 2011, Intel also automatically moved existing participant accounts in the 401(k) Plan into the customized Intel TDFs unless the participant opted out. According to a PIMCO DC Dialogue interview with Stuart Odell, in March/April 2014, approximately 60% of 401(k) Plan participants had at least a portion of their accounts invested in the Intel TDFs.[8]

**B. Fiduciary Responsibility for Investment of Assets**

84.    Under Section 13(f) of both the Retirement Plan and the 401(k) Plan, the Investment Committee was responsible for selecting and evaluating the investment choices offered to participants (including the selection of the default investments under Section 12(a)) and had all the powers necessary or appropriate to accomplish those purposes, including the

---

[8] *See Odell Interview*, note 5, *supra*.

following powers:

      a.  To appoint and remove the Trustee;

      b.  to appoint and remove one or more investment managers,;

      c.  To conduct periodic reviews of the performance, costs, and expenses of the Funds, the Trustee, investment managers, and outside service providers; and

      d.  To establish and communicate to the Trustee and the investment managers from time to time its determination of the Plan's short- and long-term financial needs;,

85.    The terms of both the Retirement Plan and the 401(k) Plan require the Administrative Committee and the Investment Committee to report to the Finance Committee at least annually and to provide information necessary or appropriate to permit the Finance Committee to review the continued prudence of its appointments of the members of both Committees.

**C. The Plans' Assets**

**1. Master Trust Investment Funds**

86.    The Plans' assets are invested entirely in nine Master Trusts, referred to herein as the "Investment Funds." The financial statements attached to the 2014 Forms 5500 for the Investment Funds report the following holdings:

      a.  Alternative Investments (*i.e,* Private Equity Fund): invests in more than fifty private equity investment partnerships;

      b.  Commodities Fund: invests in two commodities funds and a commodities hedge fund;

      c.  Emerging Markets Fund: invests in two emerging market funds and two emerging market private equity funds;

      d.  Global Bond Fund: invests in government, US corporate and international debt securities;

      e.  Hedge Fund: invests in more than twenty hedge fund investment partnerships. Some hedge funds initially were included in Alternative Investments, including

an "absolute return fund and a "Long Short Fund." In 2011, those funds became the foundation of the Hedge Fund;

f.  International Stock Fund: invests in two international stock funds and equity securities;

g.  Small Cap Fund: invests in three small cap funds and small cap equity securities;

h.  Stable Value Fund: invests in several guaranteed investment contracts and pooled separate accounts; and

i.  U.S. Large Cap Fund: invests in four large cap equity funds.

87.    The Investment Funds are structured as multi-manager Master Trusts.

88.    Each fund or separate account manager within an Investment Fund buys, holds, and sells securities (or other assets) under the direction of an investment manager or investment advisor. Before 2015, the Investment Committee selected the funds, investment managers, advisors, and securities for the Investment Funds, and determined what percentages of the TDFs and Global IGD Fund would be allocated to each of the Investment Funds.

89.    The Investment Funds represent the various asset classes into which the Intel TDFs' assets and the IGD Fund's assets were allocated. Thus, the participants' Retirement Plan and 401(k) Plan accounts were invested in the TDFs and the IGD Fund, which, in turn, were invested in the Investment Funds.

90.    An asset allocation fund is a portfolio consisting of a diverse set of asset classes such as equities, bonds, and international securities, and may be structured as a "fund of funds" or invest directly in securities representative of the asset classes.

91.    Table 1 below lists the Investment Funds, the total assets in each, the percentage of each that is owned by the 401(k) Plan and the Retirement Plan, and the dollar value of the 401(k) Plan's and Retirement Plan's ownership positions, all as of December 31, 2013.

**TABLE 1**

| INTEL CUSTOM FUNDS BY PLAN | | | | | |
|---|---|---|---|---|---|
| Fund | Total Assets | Retirement Plan | Percent | 401(k) Plan | Percent |
| Hedge | $2,602,687,097 | $1,599,005,482 | 61.44% | $831,790,092 | 31.96% |

| | | | | |
|---|---|---|---|---|
| Commodities | $333,351,767 | $176,467,758 | 52.94% | $154,176,373 | 46.25% |
| Alternative | $553,228,376 | $589,257,905 | 106.51%[9] | $2,604,442 | 0.47% |
| Large Cap | $2,080,233,423 | $1,102,726,011 | 53.01% | $959,788,976 | 46.14% |
| Small Cap | $383,080,688 | $146,752,085 | 38.31% | $232,113,641 | 60.59% |
| International Stock | $1,186,174,161 | $ 882,605,159 | 74.41% | $809,986,075 | 68.29% |
| Emerging Markets | $1,714,258,845 | $ 664,265,617 | 38.75% | $ 499,948,308 | 29.16% |
| Stable Value | $ 636,729,584 | $ 126,768,324 | 19.91% | $ 510,719,288 | 80.21% |
| Global Bond | $ 1,694,631,401 | $ 993,860,710 | 58.65% | $ 316,074,748 | 18.7% |

92.     The Plans' financial statements filed with the Department of Labor together with the Forms 5500 reflect similar allocations in 2011, 2012 and 2014.

**2.  The Retirement Plan and the IGD Fund**

93.     Until January 1, 2015, participants in the Retirement Plan who were under 50 years old did not have any ability to direct the investment of their individual accounts. Rather, until that time, the Investment Committee directed the Retirement Plan to allocate substantially all of its assets to the IGD Fund. The IGD Fund, in turn, invested in a mix of Investment Funds, as explained above.

94.     The Intel IGD Fund is a portfolio invested in the Investment Funds, representing various asset classes. It is not a fund as such, but rather an asset allocation model that directs the assets of the Retirement Plan and the 401(k) Plan into the various Investment Funds. The Retirement Plan and the 401(k) Plan own a percentage of each Investment Fund, as shown in Table 1, above.

95.     The Intel IGD Fund is managed by the Investment Committee, which dictates the asset allocation model, chooses which percentages of the Intel IGD Fund will be invested in

[9] The numbers for the alternative fund represent anomalies reported in the Form 5500s. The 2013 Form 5500 for the Alternative Fund reports total net assets of $553 million while the 2013 5500 for the Retirement Plan reports that the Retirement Plan's interest in the Alternative Fund was $589 million.

each of the nine Investment Funds representing the various asset classes, and chooses the investments and investment managers for each of the Investment Funds, including the various limited partnerships and LLCs that make up the Private Equity and Hedge Funds.

96.     The IGD Fund's substantial allocation to private equity, commodities, and hedge fund investments differs markedly from the typical allocation of peer-balanced funds. That misallocation was the primary cause of the Fund's underperformance in recent years.

97.     Beginning in 2009, the Investment Committee began dramatically increasing the Retirement Plan's investments in private equity, hedge funds, and commodities that were included in the IGD Fund.

98.     At the end of 2008, the IGD Fund held approximately 6.4% of its assets, or $243 million, in private equity, hedge funds, and commodities. By the end of 2009, the Retirement Plan had allocated $768 million to the Alternative Fund, with approximately $606 million of those assets invested in hedge funds and $93 million invested in private equity partnerships.

99.     In 2010, the Retirement Plan's investment in private equity increased to $245 million, it invested $246 million in commodities, and its allocation to hedge funds increased to approximately $697 million. By the end of 2010, the IGD Fund held about 22.23% of its assets, or about $1.2 billion, in commodities, private equity, and hedge funds.

100.     By the end of 2011, the hedge fund investments in the Retirement Plan increased to ***$1.1 billion*** and private equity added another $100 million, bringing the total amount allocated to these "alternative" investments to ***almost 33% of the fund's portfolio***, or approximately $1.67 billion.

101.     By the end of 2013, the Retirement Plan held approximately ***$2.4 billion***, or approximately 36%, of its assets in private equity, hedge funds, and commodities. Between 2009 and 2013, the Investment Committee caused the IGD Fund to increase its allocation to private equity, hedge funds, and commodities from 6.4% of total assets to nearly 36% of total assets, an increase of 590%, and raised the dollar value of the Fund's investment in such investments from an estimated $243 million to almost $2.33 billion, ***nearly ten times the prior***

1  *figure*.

2      **3.  The Intel TDFs**

3      102.    The Investment Committee has included Intel's custom TDFs in the Plans

4  throughout the Target Date Class Period.

5      103.    A target date fund is designed for participants who do not want to create their

6  own asset allocation from the plan's available investment choices, and is designed to allocate

7  assets among the major asset classes in percentages that are deemed appropriate for an investor

8  who will reach age 65 at or near the fund's target date. Target date funds hold a mix of asset

9  classes and follows what is known as a "glide path." A glide path describes a fund's asset

10  reallocation strategy, which becomes more conservative as the fund approaches its target date;

11  that is, the year that is closest to the year the plan participant expects to retire, usually age 65. A

12  target date fund's number represents the approximate year when a participant expects to begin

13  withdrawing benefits. Thus, a participant who anticipates retiring at 65 in or near 2035

14  generally would select a 2035 fund.

15      104.    The Intel TDFs offered in the Plans are not funds in the traditional sense — in

16  which plan participants hold units or shares of the fund. Instead, the Intel TDFs are models for

17  allocating assets among other funds available in the Plan — effectively, an asset allocation

18  service.

19      105.    The Investment Committee determined the allocations and selected the

20  underlying Investment Funds to which the Intel TDFs allocate the Plans' and participants'

21  assets, but there is no actual target date fund as a distinct entity. Rather, each participant is

22  placed in an asset allocation model chosen and managed by the Investment Committee (and

23  now, by Alliance Bernstein), which provides each participant investing in the fund with a

24  proportionate interest in the underlying Investment Funds, based on the allocation percentages

25  prescribed by the model.

26      106.    The Intel TDFs, in other words, are not mutual funds, investment companies or

27  collective investment vehicles that issue shares. Rather, by investing in an Intel TDF, a plan

28

participant invests in a specifically weighted selection of investments, in which weighting changes over time based on allocation percentages selected the Investment Committee. And the selected investments, *i.e.*, the Investment Funds, also are chosen and managed by the Investment Committee.

107.   All the Intel TDFs offered in the Plans are invested in the same nine Investment Funds, and share the same glide path. A "glide path" is the formula by which assets in the target date fund are reallocated across asset classes in order to reduce the overall risk profile of the fund gradually as the fund approaches its target date. The amount allocated to each of the underlying Investment Funds varies for each TDF depending on its position along that glide path. As the target date approaches, the particular Intel TDF reallocates assets to increase the percentage allocated to less risky investments, like bonds, and away from the generally riskier equity investments. Each successive Intel TDF, moving from the riskiest asset allocation for the youngest participants to the least risky for participants at or close to retirement, has a target date that is five years earlier than the one before it, and those five-year increments determine the position of each TDF along the glide path.

108.   Before 2011, Defendants called the customized asset allocation portfolios LifeStage Funds. In or around 2011, the Investment Committee created a new suite of customized target date portfolios and called them Target Date Funds.

109.   Beginning in 2011, the Intel TDFs invested a large percentage of 401(k) Plan TDF assets in hedge funds and commodities -- approximately 23% in the aggregate in 2011. The Intel TDFs also materially increased the allocation to international equities in comparison to peer TDFs.

110.   Bill Parish, an independent registered investment advisor, observed in "Intel Q4 2013 Earnings – Time to Fix Pension Plan" (January 16, 2014), that Intel's 401(k) and Retirement Plans "have been infiltrated by hedge funds," commenting that Intel's decision to

invest heavily in hedge funds amounted to "institutional gambling with employees['] assets." [10]

111.   The Oregonian newspaper reported on August 30, 2014 in *What's Inside Intel's retirement plans? Hedge funds. Lots of 'em*: "Intel's 401k-type plans are unusual in a couple of ways that aren't comforting to some investors and financial advisers. It's embarked, essentially, on an experiment with nearly $14 billion in worker retirement money for more than 63,000 participants." As this article observed, Intel decided to use "expensive, opaque and potentially risky hedge funds in its main 401k investment options . . . ." Hunsberger, *supra* note 5.

112.   The Investment Committee implemented an asset allocation strategy for the Intel TDFs that grossly over-weighted allocations to hedge funds, private equity and commodities, and significantly over-weighted the allocation to international equities compared to other target date funds available in the marketplace.

113.   As reported on the related Fund Fact Sheet, the Intel 2030 TDF had nearly 23% of assets allocated to hedge funds, more than 39% allocated to international equities and 4.5% allocated to commodities—***a total of nearly two-thirds of its portfolio*** -- as of March 31, 2014. ***Typical target date funds with a "target date" of 2030 do not allocate any assets to hedge funds***, and very few peer target date funds have even small allocations to commodities. Further, peer target date funds allocate 70% of equity assets to U.S. stocks and 30% to international equities, whereas the Intel 2030 TDF allocates nearly 60% of its equity investments to foreign stocks and 40% to US equities.

114.   As of 2015, approximately $3.63 billion of the 401(k) Plan's assets are in the Intel TDFs.[11]

---

[10] Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & Company Registered Investment Advisor Blog (January 16, 2014), *available at* http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/ (last visited Jan. 26, 2016).

[11] Robert Steyer, *Intel hires manager for target-date, global funds*, Pensions & Investments (June 15, 2015), *available at* http://www.pionline.com/article/20150615/PRINT/306159980/intel-hires-manager-for-target-dateglobal-funds (last visited Jan. 26, 2016).

1     *TDF Underperformance.*

2        115.    As a result of Defendants' asset allocation and investment decisions, the Fund

3 Fact Sheet indicates that Intel 2030 TDF underperformed *the average* of its peers by

4 approximately 250 basis points (2.5%) for the one-year period, 150 basis points (1.5%) for the

5 three-year period and 200 basis points (2.0%) for the five-year period ending March 31, 2014.

6 Morningstar commented that the entire family of Intel TDFs has underperformed peers because

7 of these allocation and investment decisions.

8        116.    Despite the differences in the asset allocations of some of the TDFs, Intel

9 considers target date funds generally to be a single investment option. In describing a major

10 restructuring of the investment choices available in the Plan that reduced the number of

11 investment options from 72 to 20, Stuart Odell, Assistant Treasurer of Retirement Investments,

12 stated that "we reduced our core investment lineup to 20 options, counting all the target date

13 funds as one investment option."[12]

14        117.    Target date funds are designed so that a participant will invest one hundred

15 percent of his or her account in a single target date fund. From a plan design perspective, a

16 participant does not really have 12 different funds from among which to choose. All twelve

17 TDFs are allocated among the same underlying investments; only the percentage of each fund

18 allocated to those investments changes. And even those percentages are determined in relation

19 to the allocation percentages of the entire series as a whole. There is a single glide path for the

20 series, with each TDF positioned at a different point along that glide path. Therefore, the

21 Investment Committee's asset allocation and investment decisions affect the entire series of

22 Intel TDFs as a whole.

23 *The Intel TDFs Charge Very High Fees.*

24        118.    Before the Investment Committee changed the Intel TDF allocations in 2011, the

25 fees for the Intel TDFs ranged from 65 basis points to 71 basis points.

26

27 [12] *Odell Interview.*

28

119.    Even though the fees for the Intel TDFs already were substantially higher than index-based TDFs such as those offered by any number of other target date funds, the increased allocation to hedge funds beginning in 2011 significantly increased the expenses of the Intel TDFs, almost doubling the range of fees to between 130 to 136 basis points. This significant investment and allocation to high-fee hedge funds and private equity added fees but no value, especially given the (purportedly) retirement-oriented nature of the Plans. And it increased their risk.

120.    The Morningstar annual Target Date Series Research Paper ("the Morningstar Survey"), which included 42 actively and passively managed target date funds in the annual survey for 2013, indicates that the Intel TDF's fees are higher than those of any other fund in the survey. The following Table shows a sampling of the fees charged by other actively managed target date funds included in the Morningstar survey:

| Expense Ratio Comparison – Actively Managed Target Date Funds | | | | |
|---|---|---|---|---|
| Target Date Fund | 2013 Avg Exp Ratio | 2012 Avg Exp Ratio | % Actively Managed | Percentile Rank |
| TIAA-CREF Lifecycle | 0.56 | 0.6 | 100 | 8.8 |
| Fidelity Freedom K | 0.63 | 0.06 | 97.3 | 11.1 |
| Vantagepoint Milestone | 0.65 | 0.88 | 79.7 | 21.7 |
| John Hancock Retirement Choices | 0.69 | | 49.3 | 18.6 |
| Harbor Target Retirement | 0.71 | 0.7 | 100 | 33.8 |
| Fidelity Freedom | 0.73 | 0.67 | 97.2 | 30.4 |
| Schwab Target | 0.73 | 0.76 | 78.3 | 26.4 |
| T. Rowe Price Retirement | 0.79 | 0.79 | 86.3 | 32.8 |
| USAA Target Retirement | 0.8 | 0.74 | 94.5 | 41.6 |
| JPMorgan Smart Retirement | 0.82 | 0.87 | 99.8 | 35.1 |

| PIMCO Real Retirement | 0.85 | 1 | 91.8 | 59.3 |
|---|---|---|---|---|
| BlackRock LifePath | 0.93 | 0.94 | 73.4 | 63.6 |
| Great-West Lifetime I | 0.99 | | 62.4 | 70.5 |
| **Intel Target Date Funds** (2015) | **1.33** | | | **??** |

121.    Moreover, in stark contrast to current trends, the Intel TDFs have rising expenses, while the TDF industry generally has been lowering expenses.[13]

### 4.  The Intel TDFs Imprudently Invested in Hedge Funds

122.    Target date funds, in addition to focusing on the importance of reducing portfolio risk as the individual investor approaches retirement age, rely on a core element of Modern Portfolio Theory: the importance of allocating an individual's investment portfolio among asset classes that have low correlations to one another. For example, when the stock market declines, the bond market tends to rise. An allocation to both can significantly reduce the effects of market volatility on a portfolio.

123.    Brinson, Beebower and Hood studied the impacts of asset allocation on 91 pension funds over a 10-year period and found that 94% of performance can be explained purely by the asset allocation and only 6% is explained by market timing and security selection.[14] The Brinson study refutes the theoretical delivery of returns above the benchmark promised by active securities selection, as with hedge funds. Market timing and security selection are typically tied to near-term cycles that tend to wash out over time. But TDFs are designed to be held for a long period of time—to retirement age and beyond.

---

[13] Brent Hunsberger, *What's* behind *the changes to Intel's worker retirement plans,* The Oregonian (May 2, 2015), *available at* http://www.oregonlive.conm/finance/index.ssf/2015/whats_behind_the_changes_to_in.html last visted Jan. 26, 2016.

[14] Gary P. Brinson et al., *Determinants of Portfolio Performance*, 42 Fin. Analysts Journal 133, 133-138 (1995).

124.   The Brinson study argues for low-cost, passive fund management with strictly disciplined asset allocation methodologies at the core of the investment process as being the most effective and prudent approach to managing long-term, retirement-oriented assets such as TDFs. This is what target date funds should seek to achieve as a one-stop fund for individual retirement investors.

125.   Hedge funds contradict these investment theories. Hedge funds are designed to enable the manager to invest in near-term opportunities without adhering to a stated fund objective. Most off-the-shelf TDFs go to great lengths to select underlying funds with clear objectives in order to ensure that the design of the target date fund can be achieved, *i.e.* that the risk profile of the portfolio can be effectively and efficiently measured and managed.

126.   Funds subject to the Investment Company Act of 1940 (also known simply as "the '40 Act" or the ICA), i.e., mutual funds, in particular, are obligated to state and adhere to their investment objectives – thus, a fund that intends to invest in large cap value stocks generally will stay in large-cap value stocks. Mutual funds are constrained in their investments by the publicly disclosed investment strategy set forth in the mutual fund's prospectus.

127.   Most off-the-shelf TDFs avoid any meaningful use of leverage (as leverage is strictly constrained in 1940 Act funds) and the use of derivatives to implement the overall fund strategy.[15] Thus the portfolio manager of a standard target date fund has an abundance of data regarding the makeup of the portfolio and assurance that that the manager will pursue the stated strategy. This is especially true with index-based TDFs where computer programs dictate strict adherence to the given index and afford no manager discretion to deviate from guidelines and strategies.

128.   Hedge funds are, by operation of law, limited to "accredited investors" who have

---

[15] As used herein, the term "leverage" refers to the financial industry term for using borrowed capital or debt financing to increase returns on an investment. Leverage magnifies both gains and losses, and therefore risk, and for this reason is tightly regulated in certain areas. *See* Investopedia, *Leverage*, *available at* http://www.investopedia.com/terms/l/leverage.asp (last visited Jan. 28, 2016).

more than $200,000 in annual income and/or more than $1,000,000 in net worth. Secs. And Exchange Comm'n, *Investor Bulletin: Accredited Investors, available at* https://www.sec.gov/investor/alerts/ib_accreditedinvestors.pdf (last vsited Jan. 30, 2016). The reason for limiting investment in hedge funds to those accredited investors is to restrict these investments to those who can afford to lose their invested principal. Retirement plans and the available investment choices offered by those plans need to be understandable by the average employee. Highly compensated executives with a financial background can choose to take more risk, but TDFs are designed for those with neither the training nor the inclination to create their own asset allocations. Thus, they need to be constructed to protect the average employee.

129.     The Intel Hedge Fund 2013 Annual Return listed on the Form 5500 filed with the Department of Labor reports that it held interests in 23 different hedge funds. Of those funds at least six are primarily deemed "Multi-Strategy," five are deemed "Directional," five involved "Distressed (or Stressed)" assets and eight are "Event-Driven." Several list many strategies. All of these represent some of the most potentially volatile of hedge fund strategies with Multi-Strategy in particular being the most ambiguous. As the name itself indicates, the managers can do pretty much whatever they want.

130.     Perhaps the most important design feature of a target date fund is that it promises, through its formula asset allocation, to create an overall level of risk that is appropriate for someone who expects to retire in or near the fund's target year. That level of risk is measured by the volatility of the underlying investments which, in turn, is measured by well-developed and clearly defined methodologies that fit easily into what the DOL refers to as generally accepted investment theory. By their very nature, hedge funds, that, despite their moniker, have evolved into little more than private, unregistered funds that are not specifically designed to "hedge" against any specific investment risk, defy the risk analysis that can be applied to registered funds invested in equity and fixed income security investments, and that is essential to the design of target date funds.

131.     The data on the poor performance of hedge funds is readily available and well

publicized.[16] Large public pension funds are dumping their investments into those funds as being "too complicated and expensive."[17]

132.    Further, the vast majority of plan participants will roll their 401(k) investments into an IRA (upon retirement or changing employers) or into a new employer's plan. Thus portability and liquidity are important considerations in constructing and selecting a TDF. But hedge funds are not liquid and not portable. During a volatile or down market, participants attempting to liquidate Intel TDF holdings could find themselves constrained or forced to lock-in substantial realized losses.

### 5.   Hedge Funds and Private Equity Generally Are Not Suitable For Inclusion in Balanced Funds Like The IGD Fund

133.    Like TDFs, balanced funds are designed as a one-stop fund for retirement plan investors. A typical 60/40 equity/bond balanced fund is intended to reflect the broad performance of the key securities markets in a ratio that balances risk and return suitable for the average investor.

134.    Like TDFs, balanced funds in retirement plans need minimum levels of liquidity, and volatility. And given the investment principles discussed above, the surest way to consistent and meaningful performance is low-cost index funds. For these reasons, hedge funds and private equity are generally not suitable for balanced funds and few, if any, balanced fund portfolio managers invest in hedge funds and private equity. As the following detailed analyses of hedge funds and private equity reflect, hedge funds and private equity have high and hidden fees, uncompensated risk, higher-than-expected volatility, and an undesirable positive

---

[16] *See, e.g.,* Alexandra Stevenson, *Hedge Funds Close Doors, Facing Low Returns and Investor Scrutiny*(May 17, 2015), available at
http://www.nytimes.com/2015/05/18/business/dealbook/facing-low-returns-and-balky-investors-more-hedge-funds-close-doors.html?_r=2 (last visited Jan. 26, 2016).
[17] Alexandra Stevenson & Michael Corkery, *Calpers, Nation's Biggest Pension Fund, to End Hedge Fund Investments*, The New York Times (Sept. 15, 2014), *available at* http://dealbook.nytimes.com/2014/09/15/nations-biggest-pension-fund-to-end-hedge-fund-investments/ (last visited Jan. 26, 2016).

correlation to other asset classes. Moreover, they lack transparency, and, unlike mutual funds, have virtually no constraints on investment decisions, notwithstanding the nominal strategy or asset class that might be described in the offering and partnership documents.

135.    Additionally, one of the defining features of hedge funds is that they are only required to maintain liquidity (e.g. the ability for investors to withdraw funds) on a monthly or quarterly basis, depending on when they are required to submit to regular reporting. *See* Stephen Foley, *Hedge Fund Investors Look for Liquid Alternatives,* Fin. Times (Feb.19, 2014), *available at* http://www.ft.com/cms/s/0/aa45fea6-993c-11e3-b3a2-00144feab7de.html#axzz3yilbZj7L (last visited Jan. 30, 2016). In the retirement plan context, by investing in investments like hedge funds, and in addition to all of the other attendant risks and problems, retirement plans like the Intel Plans at issue create significant liquidity problems for themselves in the event participants want to withdraw their funds. To counteract this the Plans were forced to take increased cash positions as the Plans' hedge fund investments grew, depriving investors of the benefits of investment growth had those funds been invested in traditional assets rather than cash to counterbalance the illiquidity associated with the hedge funds and private equity.

### 6.  Risks and Costs of Hedge Funds and Private Equity

136.    Hedge funds and private equity funds generally are structured as investment partnerships or limited liability companies (LLCs). The investors are limited partners or members and the managers are general partners or managing members. Managers typically are paid under a "2 and 20" formula, meaning that the manager receives an investment management fee of 2% of the assets under management and 20% of the profits generated by the fund's investments, which is usually in the form of a "carried interest." A "carried interest" is technically an equity interest in the fund, the amount of which is determined as 20% of the profits in excess of a specified target rate of return. That aspect of the "carried interest," that allows the hedge fund or private equity manager to treat the amount received as consideration for the sale or exchange of an equity interest in the fund and taxed as a capital gain rather than ordinary income, and the source for Warren Buffet's now famous comment that many of the

super wealthy, such as hedge fund managers, pay a lower tax rate than does his secretary.

137.   A "hedge fund" pools investor assets to pursue a variety of active management strategies. Hedge funds are exempt from registration as an investment company by virtue of Section 3(c)(1) or 3(c) (7) of the ICA. Hedge funds were described succinctly in the report of the Advisory Council on Employee Welfare and Pension Benefits to the Secretary of Labor regarding the use of hedge funds and private equity in pension plans (the "Advisory Council Report"):

> Although the term "hedge fund" is widely used, it does not have a technical definition. Rather it refers to a diverse group of funds that are not registered with the Securities and Exchange Commission ("SEC"). Hedge funds invest in different types of assets, e.g., long and/or short positions in exchange traded securities, exchange traded and off-exchange derivatives, currencies, commodities and different types of investment products. They often use relatively high levels of leverage. As such, hedge funds do not constitute an asset class but rather provide access to particular trading strategies that may be employed by specific fund managers.[18]

138.   The term "private equity" refers to a form of alternative investment that uses pooled funds to invest in privately held companies. Investors are generally described as "limited partners."

139.   Private equity investments pose several problems for retirement plans like the Intel Plans at issue. These problems generally make private equity investments imprudent for the Intel Plans. In fact, the four largest TDF providers in the market, BlackRock, Fidelity, T. Rowe Price, and Vanguard, do not include private equity in their TDF funds.[19]

140.   Hedge funds invest in many different types of assets, and are subject to a variety

---

[18] ERISA Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Secretary of Labor: *Hedge Funds and Private Equity Investments*, at 6 (Nov. 2011), *available at* http://www.dol.gov/ebsa/pdf/2011ACReport3.pdf (last visited Jan. 26, 2016) [hereinafter *Advisory Council Report*].

[19] Margaret Collins & Devin Banerjee, *Would You Like Some Private Equity in Your 401(k)?*, Bloomberg Businessweek, (Apr. 4, 2013). *available at* http://www.bloomberg.com/bw/articles/2013-04-04/would-you-like-some-private-equity-in-your-401-k (last visited Jan. 26, 2016).

of risks not typically found in mutual funds or other collective investment vehicles with more clearly defined investment strategies and guidelines, and organizational and regulatory oversight. These risks include:

 a. Valuation Risk – For purposes of fairly valuing the assets of a plan, accountants classify assets as Level 1, Level 2 or Level 3. Level 1 represents those assets the value of which can be readily determined by reference to directly observable inputs. If, for example, one owns a share of GM, fair market value is readily available by reference to the market on which that stock is traded. All of the assets invested in hedge funds or private equity are categorized as either Tier 2 or Tier 3, meaning that even when a hedge fund invests in a listed security, since the investor must rely on the fund manager because he or she will not know what that security is. Private equity is in Tier 3, in which unobservable inputs to the valuation methodology are significant to the measurement of the fair value of assets or liabilities. Additionally, an examination of private equity firms by the SEC (the "Bowden Report") has found deep problems in the way private equity conducts valuations of its portfolio companies.[20]

 b. Liquidity Risk – The auditor's report on the financial condition of the Plans noted that the "private equity, private energy and real estate funds are primarily closed-end funds, which are not eligible for redemption until a date in the future that currently cannot be determined. The liquidation of these investments is likely to occur at different times over the next 10 years." Likewise, the hedge funds in Intel's Hedge Fund typically require at least thirty days' notice to receive or redeem capital.[21] This circumstance has required the Intel TDFs to be

---

[20] Andrew J. Bowden, Dir. of the Office of Compliance Inspections and Examinations, Spreading Sunshine in Private Equity, Address Before Private Fund Compliance Forum (May 16, 2014), *available at* http://www.sec.gov/news/speech/2014--spch05062014ab.html (last visited Jan. 26, 2016).
[21] *Odell Interview*.

over-weighted in cash in order to provide liquidity for the TDFs in which participants can trade daily.[22] Liquidity risk also is end-loaded. When things turn bad, it will be those participants who get out early that will avoid the liquidity risk and the resulting concentration risk. Those who stay too long will be left with only the illiquid, riskier, and hard-to-value assets.

c. Lack of oversight – Hedge funds and private equity are not registered with the SEC, and are subject to few regulatory controls. Hedge funds and private equity are unregulated for the very reason that the investors are presumed to be rich, sophisticated, and able to handle the risk of loss. Additionally, a condition of the applicable exemption from registration is that the fund have no more than 100 shareholders. The only reason that the Plan can invest in hedge funds at all is a special ruling by the Securities and Exchange Commission ("SEC")[23] that allows the hedge fund to treat the Plan as a single investor, and not to count the thousands of participants who chose to invest in, or were defaulted into, the TDFs. But those participants are the very sorts of retirement investors who never choose to invest their retirement income in hedge funds, and for whom such an investment would be inappropriately risk and illiquid. The conditions of these applicable exemptions highlight the fact that the decision to invest in the hedge funds and private equity investments was the exercise of the discretionary authority of the Investment Committee and not the result of the exercise of control by a participant over the investment of his or her account.

d. Lack of transparency -- Hedge funds lack the transparency of publicly traded funds such as mutual funds. In particular, hedge funds lack transparency by

---

[22] Id at p. 7.

[23] *See* Secs. and Exchange Comm'n, *No Action Letter under Inv. Co. Act of 1940, H.E.B. Inv. & Ret. Plan*(May 18, 2001), *available at* https://www.sec.gov/divisions/investment/noaction/heb051801.htm (last visited Jan. 26, 2016).

design, because individual hedge fund managers claim a proprietary interest in their investment strategies. The desire of the hedge fund manager to keep an investment methodology private is in direct conflict with a plan fiduciary's duty to monitor such a methodology. As Randall Dodd, Director of the Financial Policy Forum, testified on September 20, 2006 before the U.S. Department of Labor, Employee Benefits Security Administration's Advisory Council on Employee Welfare and Pension Benefit Plans, "[t]he investment strategies of hedge funds are often not well known, or are so lacking in transparency – even to their own investors […]– that the investors cannot adequately assess the hedge fund investment's contribution to their overall portfolio risk." The Advisory Council Report noted that hedge funds and private equity funds "are not required to disclose details concerning their overall investment strategy, particular investment holdings or the degree of leverage being used, although some may choose to disclose some limited information on these matters. This lack of transparency may make it more difficult to evaluate how investments in such funds fit within the pension plan's overall investment strategy. While the past performance of hedge funds may provide some information, their strategies can change over time, leading to wide variations in performance."[24] Further, as discussed in paragraph 138.g., below, the Bowden Report found that many private equity managers charge hidden and inflated fees to investors in their funds.

e.   Leverage risk -- Hedge funds "can make relatively unrestricted use of leverage." *Id*. at 7. Leverage – essentially borrowed money – "can magnify profits, but can also magnify losses to the fund if the market goes against the fund's expectations."

---

[24] *Advisory Council Report* at 12.

f.   Difficulty of evaluating risk level – All of the risks noted above culminate in the risk especially critical to the design of a target date fund, and that is the risk of being unable to assess the level of risk attributable to that portion of the portfolio. The essence of a target date fund is the promise that asset allocation of the fund is designed to have a target level of risk that is appropriate for the stage of that investor's life. That becomes an empty promise when major percentages of the portfolio are allocated to assets are not susceptible to an accurate risk assessment. Including them in such a fund is the height of irresponsibility.

g.   Excessive Fees - The funds in Intel's Hedge Fund and private equity fund charge excessively high incentive fees, and inclusion of hedge fund investments in the Plans' portfolios has driven fees up.[25] The Bowden Report notes that the SEC has found that many private equity managers charge hidden and inflated fees to investors in their funds. According to Mr. Bowden, the SEC identified "violations of law or material weaknesses in controls over 50% of the time." This, according to Mr. Bowden, is "a remarkable statistic."

141.   Even without an incentive fee to erode whatever returns might accrue in positive years, a two percent annual flat fee on assets under management is high and not justified in a defined contribution plan investment. Such a fee is up to ten times as high as the average standard wholesale level fees for pension plan investments – for example, 2% versus 0.20%.[26] Indeed, one hedge fund industry expert has calculated that hedge fund managers collected 98% of the profits generated by hedge funds during the years 1998-2010.[27]

---

[25] *Odell Interview* at 8.

[26] Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & CompanyRegistered Investment Advisor Blog (January 16, 2014), *available at* http://blog.billparish.com/2014/01/16/intelq4-2013-earnings-time-to-fix-pension-plan/ (last visited Jan. 26, 2016).

[27] Simon Lack, *The Hedge Fund Industry Has Kept 98% Of The Profits In Fees*, Business Insider (Jan. 24, 2012), *available at* http://www.businessinsider.com/how-the-hedge-fund-industry-has-kept-98-of-the-profits-in-fees-2012-1 (last visited Jan. 26, 2016).

142.    Hedge funds' high fees can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees.[28]

143.    The Investment Committee purportedly chose to invest the Plans' assets in hedge funds in an attempt to reduce volatility and improve diversification and as "potentially allowing the portfolios to perform well in different market environments," although Stuart Odell claimed that that the strategy may be designed more to protect against major market events such as the financial crisis.[29]

144.    But contrary to Mr. Odell's claim,[30] hedge fund investments do not provide substantial risk reduction or risk diversification for pension plan assets because they are positively correlated to the equity market. Positive correlation means the extent to which different asset classes will simultaneously rise or fall together. Specifically, according to data compiled by the hedge fund house AQR, the HFRI Fund Weighted Composite Index – a leading hedge fund industry index – was 0.93 correlated with equity markets, or nearly 100% correlated. Thus, an investment in hedge funds is not a true hedge at all; rather it will amplify whatever is happening in the portion of a portfolio that is invested in common equity stocks. Moreover, hedge funds do not have sufficient transparency about their investments and strategies to enable plan fiduciaries to know what they own and how it is being managed. Thus, hedge fund investing is not an effective diversification tool.

145.    These risks alone present a compelling argument for excluding these types of funds or asset classes from the investment mix of target date funds, especially in a 401(k) employee-directed plan that, by design, attempts to shift the fiduciary responsibility for investment choices squarely on the shoulders of the participants. The Plan's Summary Plan

---

[28] Barbara Borbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity*, at 8 n.11
(Aug. 31, 2011), *available at* http://www.gao.gov/assets/90/82457.pdf (last visited Jan. 26, 2016)..
[29] *Odell Interview* at 5.
[30] "Given low correlations to equity . . . ." *Id* at p. 6.

Description makes it clear that the Plan is relying on the protection of ERISA section 404(c), and as a result, issues a specific warning:

> The 401(k) Savings Plan is intended to operate as an ERISA Section 404(c) plan. The Plan offers participants and beneficiaries the opportunity to exercise control over the assets contributed and accumulated on their behalf by allowing them to choose the manner in which these assets will be invested from a broad range of investment alternatives. This means that you or your beneficiaries may not hold Intel, the Plan's service providers, or any of their respective employees or agents liable as plan fiduciaries for any losses sustained in your account that are the result of your exercise of control over how your contributions are to be invested. In other words, you bear the risk of the performance of your directed investments, even if that performance is poor.

But, because hedge funds and other alternative investments permeated a material portion of the investments available to the Plans' participants, the participants had little meaningful choice about whether to invest in them.

146.   In addition to the risks that made these fund selections inappropriate for target dates funds as a matter of design, their performance was exceedingly poor.

147.   An analysis of the impact of the drag that these alternative investments had on fund performance shows that, as compared to a hypothetical fund invested in the benchmarks of the major asset classes represented in the target date funds and invested in the same proportions as the assets of the Intel TDFs, the Intel TDF's performance lagged the benchmark by an average of 1.2% year over year in its ten-year performance period.

148.   Last but not least, although it represents a small percentage of the TDF allocation, the Commodities Fund has suffered consistent losses every year since 2011, yet the Investment Committee persistently has failed take any action.

### 7.   The Intel Fiduciaries Ignored the Nature of a 401(k) Plan

149.   One of the crucial elements of the design of a participant-direct individual account plan like the Intel 401(k) Plan is that it must be understood by the average employee if it is going to serve as an effective retirement planning tool. Stuart Odell was explicit in his acknowledgement that the 401(k) Plan is Intel's primary retirement vehicle. Efforts to ensure

that plan sponsors and plan participants truly understand the terms of the plan, the nature of plan investment choices, how to build an asset allocation from among those choices, the nature of target date funds, how those funds are invested now and at the target date, and the fees associated with those investments and for plan administration, have been an all-consuming focus of the DOL's regulatory agenda since 2005. Regulations issued under ERISA Section 404(a) make explicit a range of detailed information that must be provided to all participants annually to ensure that participants understand how the plan operates and how to use the plan as an effective vehicle for retirement savings. Yet the Investment Committee created a suite of custom funds, and, in particular, a series of target date funds, so complicated and opaque that it takes a staff of investment professionals to truly understand it and manage it. This leaves one to wonder how they could have thought it was appropriate for a participant-directed plan.

150.    Stuart Odell has provided an answer to that inquiry in his interview with Stacy Schaus:

> When we considered the investment structure, we wanted to bring to the table our best thinking from the profit sharing plan, which, coupled with a floor offset, is really a hybrid defined benefit structure. In the 1980's, in lieu of a traditional pension benefit, Intel started this hybrid plan to provide participants the better of a pension benefit or the outcome of a defined contribution plan. Like many plan sponsors that oversee defined benefit plans, Intel incorporated alternatives and other diversifying assets in to out hybrid plan. We also knew that our 401(k) participants needed broader diversification to help reduce risk and improve the likelihood of achieving their goals.

In other words, the Investment Committee replicated an investment strategy that was appropriate for the management of defined benefit plan assets by a staff of professionals on behalf of Intel which would have borne the investment risk of that strategy, and incorporated that same strategy into the 401(k) Plan with the bare admonition to participants to choose wisely because Intel would not be liable for any losses suffered when participants were forced to contend with that strategy and its predicable consequences.

a.    *The Performance of the Plans' Hedge Funds Portfolio in 2008 Was Poor.*

151.    Stuart Odell, Intel's assistant treasurer for retirement plan investments, stated

that hedge funds can reduce the ups and downs of traditional stock and bond markets. Hunsberger, *supra* note 5. The Investment Committee supposedly included hedge funds in the Plans' asset allocation portfolios to reduce volatility and increase diversification.

152.     But, because they often contain the same kinds of assets already in retirement plan portfolios and correlate so strongly with the equity market generally, hedge funds should not be considered an independent asset class for purposes of diversification. Hedge funds are simply an expensive and risky form of active management.

153.     Numerous studies and reports published in the years before and after the 2008 financial crisis questioned the value of hedge funds. The Investment Committee knew or should have known during the Target Date and IGD Fund Class Periods that hedge funds were an imprudent investment for target date funds and balanced funds.

154.     Unlike more traditional investment products, hedge funds typically charge both a management fee (typically 1-2%) based upon the amount of assets under management (the "Management Fee") and an annual performance fee (typically 20%) based on the success of the fund during the time period in question (the "Performance Fee"). The disparity between the traditional management fee and the performance-based compensation arrangements with managers may create an incentive to make investments that are riskier or more speculative than would be the case if such arrangements were not in effect. Moreover, because performance-based compensation is calculated on a basis that may include unrealized appreciation of client account assets within artificially-constrained time periods, this compensation may be greater than if such compensation were based solely on realized gains.

155.     By at least as early as 2006, studies of the performance of alternative investments began to reveal that the returns produced by hedge funds—at least after 2000—did not exceed the investment performance net of fees of index-tracking mutual funds. Reports of such studies were widely published in articles such as *Rolling in It: Why Investors should kick up a fuss about hedge-fund fees*. The Economist (Nov. 16, 2006), *available at* http://www.economist.com/node/8173853 (last visited Jan. 26, 2016); *see also* The Economist,

*The New Money Men,* (Feb. 17, 2005) (citing studies), *available* at http://www.economist.com/node/3666459 (last visited Jan. 26, 2016). As a result, investors in hedge funds were taking greater risks and paying much higher fees for performance that could have been obtained for lower risk and lower fees.

156.    The Economist reported that by November 2006, hedge fund managers were receiving "Alpha pay for beta performance." Narayan Naik, of the London Business School noted in that Economist article, "pension funds ha[d] been advised to move into hedge funds by consultants," but those consultants had relied on outdated data from the 1990s and biased data regarding performance and returns.

157.    In 2013, Benchmark Financial Services, a forensic firm hired by a Rhode Island council of the American Federation of State, County and Municipal Employees, issued a report, that concluded that the Rhode Island Pension system's $2 billion investment in high-cost and opaque alternative investments in hedge funds, private equity and venture capital had failed to outperform the pension plan's peer plans.[31]

158.    Reuters reported on January 7, 2011 that both the Hennessee Group and Hedge Fund Research, groups that track performance and asset flows, reported that hedge funds gained approximately 10 percent in 2010, but lagged behind the average stock market indexes and fell short of the average equity-based mutual fund's returns.[32]

159.    In contrast, the S&P 500 index gained 12.8 percent and the average stock mutual fund rose 17.48 percent, according to data from Lipper Inc.

160.    A 2012 Economist article reported that "since 1998, the effective return to

---

[31] Benchmark Fin. Servs., *Rhode Island Public Pension Reform: Wall Street's License to Steal*, Rhode Island Council 94 (October 17, 2013), *available at* http://ricouncil94.org/portals/0/uploads/documents/rhode%20island%20x.pdf (last visited Jan. 26, 2016).

[32] Svea Herbst-Bayliss, *Hedge funds rise in 2010 but lag broader market,* Reuters (January 7, 2011), *available at* http://www.reuters.com/article/us-hedgefunds-performance-idUSTRE7063QR20110107 (last visited Jan. 26, 2016).

hedge-fund clients has only been 2.1% a year, half the return they could have achieved by investing in boring old Treasury bills." The Economist, *Rich Managers, poor clients: A devastating analysis of hedge-fund returns* (January 7, 2012), *available at* http://www.economist.com/node/21542452 (last visited Jan. 26, 2016).

161.    Surveys conducted of pension funds (both public and private) showed that fewer than half of the pension funds surveyed have investments in private equity and about one quarter have investments in hedge funds. Borbjerg, *supra* note 27, at 13-19. Among those pension plans that do invest in hedge funds and/or private equity, the investments generally represent a small share of the total plan assets. According to the Borbjerg Report one survey showed that "***the average allocation to hedge funds among plans with such investments was about 4 percent in 2007" and "among plans with investments in private equity, the average was about 5 percent***." *Id.* at 13 (emphasis added).

162.    Perhaps the most important aspect of these articles, reports and analyses is that the great majority of plans investing in hedge funds are defined benefit trusts with dedicated staffs of professionals, usually assisted by independent investment consultants, with the access, knowledge, experience and skills to evaluate these investments and their risks and performance and whose job it is to perform that analysis. The average Intel employee, who spends his or her full time performing the work that Intel requires, cannot reasonably be expected to have that capacity.

163.    Further, hedge funds' use of leverage and derivatives can cause disproportionate movements in hedge fund returns as compared to underlying asset class returns.

164.    The authors of a study first presented in 2009 and published in 2011 concluded that "the real alpha of hedge fund investors is close to zero."[33] In other words, for all the active

---

[33] Ilia D. Dichev & Gwen Yu, *Higher risk, lower returns: What hedge fund investors really earn*, 100 Journal of Financial Economics 248 (July 20, 2009), *available at* http://www.people.hbs.edu/gyu/higherrisklowerreturns.pdf  (last visited Jan. 26, 2016).

management and esoteric strategies employed by hedge fund managers, the hedge fund managers add little or no value. The authors go on to conclude that "[i]n absolute terms, the dollar-weighted returns [of hedge funds] are reliably lower than the return of the S&P 500 index, and are only marginally higher than the risk-free rate as of the end of 2008." *Id.* These authors in turn cite to other studies finding small and sporadic alpha in hedge funds. The main finding of the authors was that actual investor returns are 3 to 7 percent lower than reported hedge fund returns. They conclude in 2009 that the actual risk-return profile of hedge fund investors is much worse than investors would expect from observing hedge fund indices.

165.    In 2010, Vanguard published a report titled "Do hedge funds hedge? The experience of the Great Recession."[34] The authors compared the performance of hedge funds to broad market indices and a 60/40 portfolio of equities and bonds from October 2007 through February 2010. Their conclusion was that, with one exception, hedge funds did not provide any significant diversification beyond a 60/40 portfolio of stocks and bonds.

166.    The Economist reported on the pitfalls of hedge funds.[35] Among other things, the Economist noted that hedge funds were performing poorly in volatile markets, "the very conditions in which hedge funds are meant to prosper." The Economist presented a line chart comparing hedge fund index returns with the S&P 500, which showed extremely high correlation in volatility and performance, thus prompting the caption "Unhedged?"

167.    In sum, the downside performance of hedge funds in 2008, although superior to pure equity markets, nevertheless disappointed investors and did not provide the hedge that investors expected. Hedge funds failed to do much better than a 60/40 portfolio in 2008, and have done a lot worse since, including in the period from March 2009 to 2011, when the

---

[34] Geetesh Bhardwaj, Ph.D., *Do hedge funds hedge? The experience of the Great Recession,* Vanguard Research (2010), *available at* https://pressroom.vanguard.com/content/nonindexed/Do_hedge_funds_hedge_the_experience_of_the_great_recession.pdf (last visited Jan. 26, 2016).

[35] *Many unhappy returns*, The Economist (Aug. 20, 2011), *available at* http://www.economist.com/node/21526326 (last visited Jan. 26, 2016).

Investment Committee loaded up on hedge funds.

168.    More recently, hedge funds have continued to underperform badly and to fail to provide downside market protections. As recently reported in the New York Times,[36] hedge fund investors have suffered deep losses in 2015. Investors in prominent and lesser-known hedge funds have seen all of 2015's gains wiped out, and are now in the red. Pershing Square Capitol Management has lost 9.4%; Marcato International has lost 11.6%; Glenview Capital Management is down 13.5%. Because of continued poor performance, investors are withdrawing from hedge funds and causing many hedge funds to close. Preqin, which publishes quarterly reports on hedge fund performance, recently reported that the third quarter of 2015 was the worst quarter for hedge funds since the third quarter of 2015, posting average losses in its benchmark of 4.08%.[37] Thus the Plans and their respective participants whose accounts were invested in Intel TDFs and the IGD Fund continue to suffer substantial losses due to Defendants' breaches of fiduciary duty.

### 8.    Inadequate Disclosure of the Investments Underlying the Intel TDFs and IGD Fund

169.    As recognized by the Employee Benefits Security Administration ("EBSA") of the US Department of Labor ("DOL"), more and more employees are investing in their futures through participant-directed, defined-contribution individual account plans, known as 401(k) plans. Employees who participate in 401(k) plans assume responsibility for their retirement income by contributing part of their salary in such plans and, in many instances, by directing their own investments. These plans provide an opportunity for employees to save their own pre-

---

[36] Alexandra Stevenson, *Hedge Fund Assets Decline by Biggest Amount Since Financial Crisis*, New York Times (Oct. 20, 2015), *available at* http://www.nytimes.com/2015/10/21/business/dealbook/hedge-fundassets-decline-by-biggest-amount-since-financial-crisis.html (last visited Jan. 26, 2016).

[37] Preqin, *The Preqin Quarterly Update*: *Hedge Funds, Q3 2015* (2015), *available at* https://www.preqin.com/docs/quarterly/hf/Preqin-Quarterly-Hedge-Fund-Update-Q3-2015.pdf (last visited Jan. 26, 2016).

tax dollars in individual 401(k) accounts and to benefit from additional employer matching contributions.

170.   Fiduciaries of 401(k) plans have an affirmative obligation to provide participants with meaningful information about their rights under the plan. As stated by the EBSA in the preamble to its regulation addressing Fiduciary Requirements for Disclosure in participant-Directed Individual Account Plans:

> With the proliferation of these plans, which afford participants and beneficiaries the opportunity to direct the investment of all or a portion of the assets held in their individual plan accounts, participants and beneficiaries are increasingly responsible for making their own retirement savings decisions. This increased responsibility has led to a growing concern that participants and beneficiaries may not have access to, or if accessible, may not be considering information critical to making informed decisions about the management of their accounts, particularly information on investment choices, including attendant fees and expenses.

> \*       \*       \*

> It is the view of the Department that plan fiduciaries must take steps to ensure that participants and beneficiaries are made aware of their rights and responsibilities with respect to managing their individual plan accounts and are provided sufficient information regarding the plan, including its fees and expenses, and designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions about the management of their individual accounts.

171.   As required by 29 CFR § 2550.404a-2, each participant must be provided with the following information for each designated investment alternative under the plan:

a.   The name of the designated investment alternative;

b.   The type or category of the investment (e.g., money market fund, balanced fund, large-cap fund, etc.);

c.   If the designated investment alternative's return is not fixed;

d.   the average total return, for the 1-year, 5-year, and 10-year periods (or for the life of the alternative, if shorter) ending on the date of the most recently completed calendar year;

e.  the name and returns of an appropriate broad-based securities market index over the same 1-year, 5-year, and 10-year periods (or for the life of the alternative, if shorter);[38]

f.  the amount and description of any "shareholder-type fee," such as sales loads and charges, and redemption or surrender fees, charged directly against a participant's investment and not included in the total annual operating expenses of any designated investment alternative;

g.  total annual operating expenses of the investment, expressed as a percentage, (previously, 404(c) required disclosure only upon request); and

h.  total annual operating expenses for a one-year period expressed as a dollar amount for a $1,000 investment (assuming no returns and based on the percentage in (g) above.

172.  This extensive regulation is designed to ensure that, with respect to participants' investment choices, participants know the nature of the investment they are choosing, the risks attendant to the investment, and how much they are paying for what they are getting.

173.  The very nature of hedge funds and private equity investments made it virtually impossible for participants to receive adequate information sufficient to make informed decisions about the investment of their accounts. The simple references to hedge funds in the Fund Fact Sheets are meaningless to the average plan participant, or perhaps to anyone. Take, for example, the following statement:

> Hedge funds are broadly categorized into two trading strategies. Absolute return hedge funds seek to deliver positive returns under all market conditions. Directional hedge funds seek to provide comparable returns to the equity markets with significantly lower volatility. The funds aim to exceed the performance of the HFRI Fund of Funds Composite Index.[39]

---

[38] Such a benchmark index cannot be administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used.
[39] Fund Fact Sheet, Target Date 2030 Fund, released 3/31/2014.

Likewise, a bare reference to a "performance fee" hardly describes the carried interest that provides that performance fee. A participant might find it noteworthy that the manager was getting 20% of the investment return, year by year, even on the unrealized (and therefore uncertain) appreciation of the fund. Further, and perhaps most surprisingly, there appears to be no discussion about the investments in which the hedge funds were actually invested.

174.   Moreover, there is a ***total absence of any discussion at all*** about the private equity Alternative Investments ***despite an allocation of 27.2% of the portfolio's assets***; the second largest allocation after International Stock, which held 39.2% of the portfolio.

175.   These are egregious omissions for which there is no defense. It is possible and perhaps probable that no amount of disclosure could adequately inform the average plan participant of the nature, goals and risks of these alternative investment strategies. But that is not exculpatory for Defendants here. If it is likely that the average participant cannot comprehend the strategy and risks of an investment, if a participant should not (and probably could not) invest in hedge funds or private equity funds or trade in commodities without the assistance of professional investment advice, then including those investments in significant percentages in the TDFs into which participants are invested by default, and in the IGD Fund which was the mandatory investment for accounts in the Retirement Plan is probably inappropriate.

176.   The Investment Committee designed the 401(k) Plan to make Intel TDFs the main investment option; since 2011, eligible employees who are auto-enrolled in the 401(k) Plan are automatically invested in the appropriate vintage Intel TDF as the default investment option. Participants who are auto-enrolled in the 401(k) Plan will remain in that investment unless they affirmatively opt out.

177.   In 2014, Intel reported that 40% of the 401(k) Plan participants invested 100% of their account balances in a single Intel TDF.

178.   Similarly, the Investment Committee designed the Retirement Plan to make the IGD Fund the main investment option for participants in the Plan. Until recently the IGD Fund

was the only fund available to participants under the age of 50. As a result, more than 90% of the Retirement Plan's and participants' assets were invested via the IGD Fund.

## VII.   CLAIMS FOR RELIEF

### Count I

**Imprudence in the Design, Management and Monitoring of the Intel Target Date Funds**

179.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

180.   The Investment Committee Defendants are named fiduciaries within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). *See* ¶37, *supra*.

181.   Additionally, the Investment Committee Defendants were delegated and exercised the discretionary authority to:

  a.  determine the asset classes and sectors that would be included in the TDFs;

  b.  approve the investment strategies that would be pursued with respect to each of those asset classes;

  c.  select the managers and investment funds that would implement those strategies; and

  d.  determine the allocations of the assets of each of the TDFs among the various investment managers and investment funds selected as the underlying investments for the TDFs.

182.   In exercising that discretionary authority, the Investment Committee was required under ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

183.   The Investment Committee Defendants breached those duties by

    a.   imprudently investing in assets that were risky, illiquid, hard to value, difficult to monitor, and difficult even to understand, which required other modifications to the operation of the TDFs that created additional drags on fund performance, making those investments inappropriate for a target date fund within a participant-directed 401(k) plan;

    b.   selecting investments that performed poorly and should have been expected to perform poorly;

    c.   failing to monitor adequately the performance of the Commodities Fund or to take any reasonable action to remove the asset class from the TDFs despite years of poor performance;

    d.   failing to provide the information required by 29 CFR § 2550.404a-5 necessary to enable plan participants to make informed decisions regarding the management of their accounts; and

    e.   failing to provide the information required by 29 CFR § 2550.404c-5 for the TDFs to meet the definition of a "qualified default investment alternative."

184. The investment allocation of the Intel TDFs represents a significant departure from the target date funds offered by professional managers, and even from the ones offered by Intel's new Investment Manager, Alliance Bernstein. The 2015 Fund Fact Sheets note explicitly that the listed asset allocations are the targets of the new manager that were not expected to be achieved until a year after publication.

185. Based on this excessive allocation to risky alternative investments, the Intel TDFs all have underperformed their peer funds during the Target Date Class Period.

186. Through the foregoing conduct, the Investment Committee Defendants have (a) retained and exercised complete discretionary authority with respect to investment in the TDFs, ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(A), and in the exercise of that authority, (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Thus the Investment Committee Defendants breached their fiduciary duties to the Plans and their participants and beneficiaries and are liable to restore all losses to the Plans resulting from their investment decisions with respect to the Intel TDFs.

187. As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiff, and the Plans' participants and beneficiaries have suffered financial losses through the loss of return that would have been earned on prudent investment of the Plans' assets.

## Count II

## Imprudence in the Design, Management and Monitoring of the Global IGD Fund

188. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

189. The Investment Committee Defendants are named fiduciaries within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). *See* ¶37, *supra*.

190. Additionally, the Investment Committee Defendants were delegated and exercised the discretionary authority to:

   a. determine the asset classes and sectors that would be included in the IGD Fund;

   b. approve the investment strategies that would be pursued with respect to each of those asset classes;

   c. select the managers and investment funds that would implement those strategies; and

   d. determine the allocations of the assets of the IGD Fund among the various investment managers and investment funds selected as the underlying investments for the IGD Fund.

191. In exercising that discretionary authority, the Investment Committee was required under ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering

the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

192.   The Investment Committee Defendants breached those duties by

a.   imprudently investing in assets that were risky, illiquid, hard to value, difficult to monitor, and difficult even to understand, which required other modifications to the operation of the IGD Fund that created additional drags on fund performance, making those investments inappropriate for a balanced asset allocation fund within a participant-directed 401(k) plan;

b.   selecting investments that performed poorly and should have been expected to perform poorly; and

c.   failing to monitor adequately the performance of the Commodities Fund or to take any reasonable action to remove the asset class from the IGD Fund despite years of poor performance;

193.   The investment allocation of the Global IGD Fund represents a significant departure from the balanced funds offered by professional managers. The 2015 Fund Fact Sheets note explicitly that the listed asset allocations are the targets of the new manager that were not expected to be achieved until a year after publication. Allocations to hedge funds and private equity were even greater prior to the new asset allocation model targets determined by Alliance Bernstein.

194.   Based on this excessive allocation to alternative investments, the Intel Global IGD Fund has underperformed peer funds during the IGD Fund Class Period.

195.   Through the foregoing conduct, the Investment Committee Defendants have (a) retained and exercised complete discretionary authority with respect to investment in the IGD Fund, and in the exercise of that authority, (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and

with like aims. As fiduciaries of the Plans with respect to the administration of the Plans, the Administrative Committee Defendants were required under ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

196.    As a result of these failures, Plaintiff and participants in the Plans were not able to make informed decisions with regard to the management of their individual accounts.

197.    As a result of the Investment Committee Defendants' breaches of their fiduciary duties, Plaintiff and participants in the Plans have suffered financial losses through the loss of return that would have been earned on prudent investment of the Plans' assets.

## Count III

### Finance Committee Defendants Failure to Monitor Other Fiduciaries

198.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

199.    As named fiduciaries of the Plans, the Finance Committee Defendants were required under ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

200.    Under ERISA, a fiduciary charged with the authority to select and remove other fiduciaries or who, as a practical matter, in fact appoints other fiduciaries, has an ongoing duty to monitor the performance of those persons whom the fiduciary is empowered to remove. An

appointing fiduciary therefore must, at reasonable intervals, ensure that the fiduciary it has appointed is acting in compliance with the terms of the applicable plan, acting in accordance with ERISA and applicable law, and satisfying the needs of the plan.

201.    Under Section 13 of the Plans, the Finance Committee Defendants were responsible for the appointment and removal, and for periodically monitoring the performance, of the Investment Committee Defendants and the Administrative Committee Defendants.

202.    Each of the Finance Committee Defendants is/was individually and collectively responsible for periodically, or at least on a quarterly basis, monitoring the performance of each of the other named fiduciaries and for the removal of any breaching fiduciary. The Finance Committee Defendants breached that duty to monitor by, inter alia:

   a.  Failing to properly monitor the performance of the Investment Committee Defendants to determine whether the Committee was prudently selecting an appropriate allocation of the assets of the Plans, including via the Intel TDFs and the IGD Fund;

   b.  Failing to monitor properly the Investment Committee Defendants to ensure that the Committee was not pursuing an excessively expensive and complicated investment strategy, when other strategies that performed better with lower fees and expenses were available for investment of the assets of the Plans; and

   c.  Failing to monitor properly the performance of the Administrative Committee Defendants to determine whether the Committee was complying with its duties to disclose information regarding designated investment alternatives in the Plans;

203.    By failing to monitor properly the performance of the Finance Committee Defendants the Board of Directors (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

204.     As a result of their breaches the Finance Committee Defendants caused the Plans to suffer losses, through the payment of excessive fees for active investment in alternatives like hedge funds and private equity, and through loss of investment return that would have been gained through prudent investment of the Plans' assets.

### Count IV

### Prohibited Transaction in Violation of ERISA § 406(a) with Respect to Any Hedge Fund or Private Equity Investment Which Granted a Carried interest to Any Manager of Such Fund

205.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

206.     A carried interest is designed to be an equity interest in the entity that holds the funds' assets. It is the creation of the equity interest that allows fund managers to treat the income received in connection with that carried interest as the sale or exchange of a capital asset entitling the manager to be taxed on that income as a capital gain rather than as ordinary income.[40] The carried interest represents an equity interest in the partnership or LLC in which the Plan is investing. Therefore, when a plan like the Intel 401(k) Plan or the Retirement Plan acquires, for example, a membership interest in an LLC which provides that the manager of that LLC has a carried interest, the plan is effectively transferring a portion of its membership's interest in the LLC to the manager, even though the exact portion is to be determined at a later date.

207.     ERISA section 406(a) expressly prohibits the sale or exchange of property between a plan and a party-in-interest.

208.     The definition of "party-in-interest" includes any person providing services to the Plan.

---

[40] *See, e.g.,* Donald J. Marples, *Taxation of Hedge Fund and Private Equity Managers,* published by the Congressional Research Serv. (Mar. 14, 2014), *available at* https://www.fas.org/sgp/crs/misc/RS22689.pdf (last visited Jan. 26, 2016).

209.    The manager of a partnership or LLC that is managing the Plan's investment in that partnership or LLC is providing services to the Plan and is, therefore, a party-in-interest.

210.    Accordingly, the grant of a carried interest to the manager of a fund in connection with the acquisition by the Plan of an interest in that fund constitutes a prohibited sale or exchange of property between the Plan and a party-in-interest in violation of ERISA section 406(a). Proskauer Rose LLP, an international law firm with experience in this area of the law, advises its clients of the same, noting that "[a]ccordingly, investment advisers typically will qualify as covered service providers whenever they or an affiliate charge or receive account, incentive or management fees or carried interest for providing investment management services either directly to an ERISA–covered pension plan or to an investment fund that is deemed to hold plan assets." *See* Proskauer Rose LLP, Client Alert: Investment Advisers to ERISA Plans and Plan Asset Funds Will Be Subject to New Disclosure Obligations Effective July 1, 2012 (June 20, 2012), *available at* http://www.proskauer.com/publications/client-alert/investment-advisers-to-erisa-plans-and-plan-asset-funds-will-be-subject-to-new-disclosure-obligations-effective-july-1-2012/ (last visited Jan. 26, 2016).

211.    As an example, if the Intel 401(k) Plan invested $1 million in an LLC that, after the investment, was valued at $10 million, the Plan should have a 10% interest in the LLC. If subsequently, the LLC increased in value to $11 million and the members of the LLC were being paid out, the Plan should receive $1.1 million, less expenses. Instead, the carried interest results in the manager being distributed $20,000 of the Plan's $100,000 return on its investment, as the result of an effective transfer from the Plan to the manager of two percent of the Plan's interest in the LLC.

212.    The transfer of that two percent interest from the Plan to the manager constitutes a prohibited sale or exchange of property between the Plan and a party-in-interest. Although the managers ostensibly deny it, the payment from the Plan to the manager is undoubtedly a payment for services performed (e.g. management of the fund), but is structured by and received as a payment incident to ***the Plan's*** ownership interest in the underlying LLC. By taking a

performance-based fee in this way, as opposed to a traditional payment of fees from assets of the plan itself as an expense, the manager is able to consider this fee a capital gain as opposed to ordinary income. By styling the performance fee in this way, the manager is simply using another machination of the tax loophole that allows sophisticated investors like Warren Buffet to "pay a lower tax rate than his secretary." *See* Chris Isidore, CNN Money, *Buffett says he's still paying lower tax rate than his secretary* (Mar. 4, 2013), *available at* http://money.cnn.com/2013/03/04/news/economy/buffett-secretary-taxes/ (last visited Jan. 26, 2016). Here though, the ultimate loser in this scheme is not the IRS, but the Intel Retirement Plan and its participants.  And while the manager's characterization of that fee might yield benefits under federal income tax law, it gives rise to liability under ERISA.

213.    Defendants may try to avail themselves of certain statutory or regulatory exemptions to ERISA's provisions governing prohibited transactions. *See, e.g.*, ERISA § 408(b) *et seq.* But, many of the listed exemptions are facially inapplicable (e.g. those governing annuity contracts or collective investment trusts).  Moreover, courts consistently have held that prohibited transaction exemptions are affirmative defenses that must be raised and proved up by defendants. *See Braden v. Wal-Mart, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009) (prohibited transaction exempted must be alleged and supported by defendants, and cannot be established by motion directed to plaintiffs' pleadings), *accord Krueger v. Ameriprise Financial, Inc.*, No. 11-cv- 02781(SRN/JSM), 2012 WL 5873825, at *17 (D. Minn. Nov. 20, 2012), *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 632 (D.N.J. 2010). Some other courts have disagreed, holding that plaintiffs are required to affirmative allege the inapplicability of prohibited transaction exemptions. *See, e.g.,* See, e.g., *Leber v. Citigroup, Inc.*, No. 07 Civ. 9329(SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010), at *10; *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001).

214.    Although the Ninth Circuit has not addressed this issue, Plaintiff submits that requiring plaintiffs to affirmatively plead facts to support the non-existence of a potentially exculpatory exemption in applicable statutes or regulations would be inconsistent with this

Circuit's application of the *Iqbal* and *Twombly* pleading standards, as evidenced by, *inter alia*, *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009). Nonetheless, and out of an abundance of caution, Plaintiff alleges that no exemption to ERISA's prohibited transactions regime applies in this case.

## Count V

## Co-fiduciary Liability Under ERISA § 405

215.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein. 266. ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA:

      a.  for participating knowingly in or knowingly undertaking to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

      b.  if by failing to comply with ERISA § 404(a)(1) in the administration of the specific responsibilities which give rise to his or her status as a fiduciary, he or she has enabled such other fiduciary to commit a breach; or

      c.  for knowing of a breach by another fiduciary and failing to make reasonable efforts to remedy it.

216.   Defendants were fiduciaries within the meaning of ERISA, by the nature of their fiduciary duties with respect to the Plans, and they knew of each breach of fiduciary duty alleged herein arising out of the excessive and imprudent investment of the assets of the Plans in alternative investments. Yet they knowingly participated in those breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

217.   The Finance Committee Defendants knew that the Plans were invested heavily in alternative investments such as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because the Investment Committee created this asset allocation strategy and, under Section 13(m) of both Plan Documents, the Investment Committee was responsible for reporting not less than annually to the Finance

Committee about its actions.

218. Each member of the Investment Committee knew that the Plans were invested heavily in alternative investments such as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust because the Investment Committee created that asset allocation strategy.

219. The Finance Committee Defendants also knew that the Administrative Committee did not disclose to participants the information required in the Disclosure Regulations, particularly regarding such designated investment alternatives as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because under Section 13(m) of both Plan Documents, the Administrative Committee was responsible for reporting not less than annually to the Finance Committee about its actions.

220. The Investment Committee Defendants also knew or should have known that the Administrative Committee did not disclose to participants the information required in the Disclosure Regulations, particularly regarding such designated investment alternatives as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because they must have been aware of what information was being disclosed.

221. Each member of the Administrative Committee also knew that the Administrative Committee did not disclose to participants the information required in the Disclosure Regulations, particularly regarding such designated investment alternatives as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because they each were responsible for ensuring proper information was being disclosed.

222. Despite that knowledge, the Finance Committee Defendants, the Investment Committee Defendants and the Administrative Committee Defendants failed to act to remedy the several violations of ERISA alleged in Counts I-V.

223. Thus, each member of the Investment Committee is liable for the breaches by the other Investment Committee Defendants under ERISA § 405(a)(1) and (2).

224.    Moreover, each member of the Administrative Committee is liable for the breaches by the other Administrative Committee Defendants under ERISA § 405(a)(1) and (2).

225.    Further, each member of the Finance Committee is liable for the breaches by the other Finance Committee Defendants under ERISA § 405(a)(1) and (2).

226.    And, each of the Defendants is liable for breaches by the Investment Committee Defendants and the Administrative Committee Defendants under Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

## VIII.    ENTITLEMENT TO RELIEF

227.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the fiduciary Defendants under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plans as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plans, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

228.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A declaration that the Defendants breached their fiduciary duties under ERISA;

B. An order compelling each fiduciary found to have breached his/her/its fiduciary duties to the Plans to jointly and severally restore all losses to the Plans which resulted from the breaches of fiduciary duty or by virtue of liability under ERISA § 405;

C. An order requiring (a) the disgorgement of profit made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with any breach of fiduciary duties or violations of ERISA, (c) an order requiring

1    the Plans to divest themselves of investments in hedge funds and commodity funds or (d) any

2    other appropriate equitable monetary relief, whichever is in the best interest of the Plans;

3             1. Ordering, under ERISA § 206(d)(4), that any amount to be paid to or

4    necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in

5    part, by attaching their accounts in or benefits from the Plans;

6             2. Removing any breaching fiduciaries as fiduciaries of the Plans and

7    permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in

8    which Plaintiff or any member of the Class is a participant or beneficiary;

9             3. Appointing an independent fiduciary, at the expense of the breaching

10    fiduciaries, to administer the Plans and the management of the Plans' investments and/or

11    selection of investment options and/or to oversee the divestment of the Plans'

12    investments in hedge funds and commodity funds;

13             4. Ordering the Plans' fiduciaries to provide a full accounting of all fees paid,

14    directly or indirectly, by the Plans;

15             5. Awarding Plaintiff and the Class their attorneys' fees and costs under

16    ERISA§ 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common

17    fund doctrine;

18             6. Awarding pre-judgment and post-judgment interest; and

19             7. Awarding such other remedial or equitable relief as the Court deems

20    appropriate.

21

22    Date: January 31, 2016          /s/ Kyle G. Bates

23                             Todd M. Schneider, Esq.

                               Kyle G. Bates, Esq.

24                             SCHNEIDER WALLACE

                               COTTRELL KONECKY WOTKYNS LLP

25                             2000 Powell Street, Suite 1400

                               Emeryville, California 94608

26                             Tel: (415) 421-7100

27                             Fax: (415) 421-7105

                               TTY: (415) 421-1665

28

1    kbates@schneiderwallace.com

2    Garrett W. Wotkyns (*pro hac vice* application to be filed)

3    John J. Nestico (*pro hac vice* application to be filed)
SCHNEIDER WALLACE

4    COTTRELL KONECKY WOTKYNS LLP

5    851 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253

6    Tel: (480)428-0144
Fax: (866)505-8036

7    gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

8

9    Scot Bernstein, Esq. (SBN 94915)
**LAW OFFICES OF SCOT D. BERNSTEIN**

10    **A PROFESSIONAL CORPORATION**
101 Parkshore Drive, Suite 100

11    Folsom, California  95630
Telephone: (916) 447-0100

12    Facsimile: (916) 933-5533
*swampadero@sbernsteinlaw.com*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28